# CASES DETERMINED

AT THE

# August Term, 1913.

JANES, Appellant, vs. CITY OF RACINE and others, Respondents, and RACINE WATER COMPANY, Appellant.

*October 10—October 28, 1913.*

*Public utilities: Purchase by city: Procedure: Statutes construed: Submission to electors: Form of question: Ratification: Manner of voting: Voting machines: Constitutional law: Compensation: Providing fund in advance: Limit of indebtedness: When debt is incurred: Levy of annual tax: Issuance of bonds: Railroad commission: Duties: Waterworks: Extensions ordered after vote to purchase: Estoppel: When title passes.*

1. Ch. 665, Laws of 1907 (secs. 927—11 to 927—19, Stats.), and the Public Utility Law (secs. 1797*m*—1 to 1797*m*—109, Stats.), do not, supplementing each other, furnish a single complete method for the acquiring of public utilities by municipalities, but each in itself provides a complete procedure for that purpose in the cases to which it applies; and each of said statutes is independent of the other. In a proceeding by a city to acquire a waterworks plant pursuant to the Public Utility Law, it was not necessary, therefore, to comply with the requirements of ch. 665, Laws of 1907.

2. The primary purpose of said ch. 665, Laws of 1907, was to enable cities to construct or purchase plants by the issue of mortgage certificates, though bonds and cash were also included to make it more elastic; and it seems peculiarly adapted to situations where the amount to be raised can be definitely ascertained in advance.

3. The common council of defendant city voted to submit to its electors "the question of purchasing the Racine Water Company plant," but did not otherwise direct the form of question or manner of submission. The city clerk prepared a notice of election in which the question to be voted upon read: "Shall the city of Racine purchase its waterworks?" and this was the form in fact submitted. *Held* that, whether or not

VOL. 155 — 1

the clerk had power to determine the form of the question, a resolution adopted by the common council after the election, reciting that the city had by a majority vote of the electors determined to buy the property of the Racine Water Company, amounted to a ratification of his act.

4. The evidence in such case not disclosing that there was more than one waterworks plant in Racine, the voters were not misled and the question was properly submitted.

5. It being entirely within the discretion of the legislature to grant or withhold from the electors of a municipality the right to vote on the subject of the purchase of waterworks, it might, in granting such right, attach to it the reasonable condition that the vote should be taken in the manner prescribed by law, namely, by voting machines such as are authorized by secs. 44—1 to 44—18, Stats.; and it is immaterial whether such method is or is not a vote "by ballot" as prescribed by sec. 3, art. III, Const.

6. No fund need be provided beforehand to pay for property taken by a municipal corporation for public use, because the taxable property of the municipality constitutes a sufficient fund or pledge for the making of the just compensation contemplated by the constitution (art. I, sec. 13).

7. The acquisition by a city of the property of a public utility operating under an indeterminate permit, pursuant to the Public Utility Law, is not a condemnation but a purchase under the terms and conditions prescribed by that act, as supplemented and safeguarded by the constitution. To this the public utility agrees, as it is competent to do, by acceptance of an indeterminate permit.

8. A debt is not incurred within the meaning of sec. 3, art. XI, Const., until its amount is ascertainable, because until then it is impossible to apply the test required by the constitution, namely, the ratio between the indebtedness of the municipality and the last assessed valuation. *Crogster v. Bayfield Co.* 99 Wis. 1, distinguished.

9. In the acquisition of an existing plant by a city under the Public Utility Law, no debt is incurred by the city, within the meaning of sec. 3, art. XI, Const., when the vote to purchase is taken, but only when the price and terms become fixed by the filing of the certificates of the railroad commission and the exclusive use of the property, and presumably the title, vest in the municipality.

10. The affirmative vote by the electors of a city upon the question of purchasing waterworks which are being operated under an indeterminate permit does not immediately put an end to

such permit or franchise. *Appleton W. W. Co. v. Railroad Commission*, 154 Wis. 121, explained.

11. When the railroad commission files its certificate and the exclusive use of the plant is transferred to the city, if payment is not then made interest must be allowed in order that the purchase price shall constitute just compensation.

12. Where a city proceeds under the Public Utility Law to acquire an existing plant, sec. 3, art. XI, Const., requires that it shall, before or at the time of doing so, provide for the collection of a direct annual tax to pay therefor; and it was not necessary that the statute should contain any specific direction on that subject.

13. Under the Public Utility Law as it stands, it becomes the duty of the railroad commission, after it has determined the amount of the purchase price and the terms and conditions of the sale, to notify the municipality of the result of its action and to give it a reasonable time after such notice and before the certificate is filed to provide for the direct annual tax which the constitution prescribes.

14. Upon such notice, it becomes the duty of the municipality within such reasonable time to comply with the constitutional provision.

15. If, in view of the terms and conditions of sale imposed by the railroad commission, it becomes necessary for the municipality to issue bonds, it can do so without any further vote of the electors, since their vote to purchase the utility must be held to include a vote to raise money by the issuance of bonds if that method be deemed necessary or expedient by the common council.

16. Public health and convenience, as well as the statute, require that a public utility shall give adequate service, and such service must continue during the interval between the city's election to purchase and the time when the transaction is finally concluded by the filing of the certificate by the railroad commission. No estoppel, therefore, against the city to consummate the proceedings arises from the fact that it orders extensions of the utility plant after voting to purchase it.

17. Up to the time the certificate of the railroad commission is filed, the plant which a city proposes to purchase is the property of the public utility, and the city must pay for it as it exists at the time it is turned over.

APPEALS from a judgment of the circuit court for Racine county: E. B. BELDEN, Circuit Judge. *Affirmed.*

Action begun November 30, 1912, by a taxpayer to declare void the proceedings already taken by the city of *Racine* for its acquisition of the plant or property of the *Racine Water Company*, and to enjoin both the city of *Racine* and the *Racine Water Company* from further prosecuting such proceedings and the city of *Racine* from incurring further expense therein.

On the 20th day of June, 1908, the *Racine Water Company*, which had previously operated under a franchise granted to it by the city of *Racine* on the 18th day of March, 1886, and effective for twenty-five years, accepted an indeterminate permit under the provisions of the Public Utility Law of this state (secs. 1797m—1 to 1797m—109, inclusive, Stats. 1911: Laws of 1907, ch. 449).

On the 7th day of February, 1911, the common council of the city of *Racine* adopted the following resolution: "Resolved, that the question of the city's purchasing the *Racine Water Company* plant be submitted to a vote of the people at the coming spring election." The resolution was published in the official paper of the city of *Racine* as a part of the council proceedings prior to the election held in said city in the month of April, 1911, and the question of the purchase of the plant was discussed in the public press of the city and among the voters before said election. Thereafter the city clerk, without any specific direction by the city council, prepared a notice of election, which was duly published, and the question submitted to the voters was as follows: "Shall the city of *Racine* purchase its water works?"

At the election the voting was done by the use of voting machines, pursuant to the provisions of ch. 459, Laws of 1901, as amended by ch. 495, Laws of 1905. The result of the election showed that 2,526 voted Yes and 466 voted No upon the question. The questions required by ch. 665, Laws of 1907, were never submitted to the voters of the city nor

has the city of *Racine* ever complied with any of the provisions of ch. 665.

On the 2d day of May, 1911, the city of *Racine* adopted a resolution wherein it recited, "Whereas, the city of *Racine*, by a vote of a majority of the electors voting thereon at the regular municipal election held in said city on the 4th day of April, 1911, at which election the question of the purchase of the water works plant was submitted to a vote of the electors of said city, determined to purchase the Racine water works plant," and wherein it provided for giving of notice to the *Racine Water Company* of its determination to acquire the company's property in accordance with the provisions of secs. 1797*m*—79 to 1797*m*—86, inclusive, of the Statutes of 1911. Thereafter due notice was given to the *Racine Water Company* and the railroad commission of the state of Wisconsin as required by the Public Utility Law.

At the time of the adoption of the resolution of May 2, 1911, the city of *Racine* had not, nor has it since, levied any tax, issued or provided for issuing any bonds, or otherwise provided any fund for the payment for the plant of the *Racine Water Company* or any means of obtaining such fund aside from the general provisions of law upon that subject, nor had the city either by its common council or by its electors determined in any manner how or when the plant should be paid for. Subsequently, and pursuant to a request by the city, the railroad commission of Wisconsin proceeded to make an *ex parte* and tentative valuation of the property of the *Racine Water Company* actually used and useful for the convenience of the public, which tentative valuation was fixed by it at the sum of $775,347. This tentative valuation included nothing for the going value of the plant, for certain service pipes extending from the street mains to the curb lines, nor did it include any extensions to the water-distributing system ordered by the common council between April 4, 1911, and January 1,

1912. The *Water Company* rejected such tentative valuation and refused to accept it as a basis of the acquisition of said plant by the city, whereupon the railroad commission gave notice to the *Racine Water Company* and the city of *Racine* that it would on the 1st of April, 1912, proceed to hear testimony to determine the value of said property and the just compensation to be paid therefor by the defendant city, and the terms and conditions upon which the same should be taken over and acquired by the city, which said proceeding is still pending before said railroad commission undetermined.

In April and May, 1911, the assessed valuation of the taxable property of the city of *Racine* was $24,464,231. For 1911 the assessed valuation of the city of *Racine* was $26,596,004. In 1912 the value of all taxable property in said city, as made by the assessment officers thereof, was $26,552,448, but upon a revaluation made pursuant to law by the tax commission of Wisconsin, completed on or about the 8th day of February, 1913, the entire assessed valuation of all taxable property of said city was fixed at $50,427,243. Between the 1st day of May, 1911, and the 30th day of November, 1912, the outstanding bonded indebtedness of the city of *Racine* ranged from $664,000 to $744,000. In addition to its bonded indebtedness it owed on April 4, 1911, the sum of $31,533.50.

Since the 4th day of April, 1911, the city has ordered and required the company from time to time to extend and enlarge its water-distributing system and has required it to expend in so doing the sum of $46,986.32. In June, 1913, at the time of the trial, the company had under consideration further additions and extensions ordered by the city, the estimated cost of which when completed will be $22,172.90. The company has also during said time made other necessary additions and extensions to its water plant at a further cost of $51,064.86.

Under its charter the city had power to levy a tax not exceeding three and one-half per cent. of the assessed value of its real and personal property. The amount of taxes required to be levied annually for city, county, and school taxes, and for customary municipal purposes, was about two per cent. of the assessed value of its property.

The trial court held:

"That the election of April 4, 1911, and the notice given of said election and the notice given of the submission at such election of the question of the purchase by the city of *Racine* of its water works were in all respects valid and sufficient for the purpose of submitting to the voters of the question of the purchase of the plant and property of *Racine Water Company* actually used and useful for the convenience of the public, and that no notice of vote pursuant to ch. 665, Laws of 1907, was necessary before instituting proceedings before the railroad commission for a valuation of said property under the Public Utilities Act.

"That the use of said voting machines for the purpose of said referendum was not unconstitutional, but the said vote was taken according to law.

"That it was not necessary for the city of *Racine*, before the commencement of proceedings for said purchase or before the determination of the railroad commission of the terms and conditions of sale, to raise the money for said purchase or to make provision by levying taxes or issuing bonds therefor.

"That it does not appear that the city of *Racine* would not be able to comply with the terms and conditions of purchase which may be fixed by the railroad commission.

"That it does not appear that in order to comply with the terms and conditions of purchase to be fixed by the railroad commission the city will exceed the constitutional limit of indebtedness.

"That the city of *Racine* is not estopped, by ordering and causing extensions to be made, from continuing and going on with said proceeding before the railroad commission.

"That the plaintiff was not guilty of such laches as would prevent the bringing of this action.

"That under the facts stipulated and proved the plaintiff has no cause of action and that the same should be dismissed with costs."

From a judgment entered accordingly, the plaintiff, and the defendant the *Racine Water Company,* which filed both an answer and a cross-complaint in which it asked for substantially the same relief as the plaintiff, appealed.

For the appellant *Janes* there was a brief by *Simmons & Walker;* for the appellant *Racine Water Company* there were briefs by *Kearney, Thompson & Myers;* and the cause was argued orally by *John B. Simmons* and *Thomas M. Kearney.* They contended, *inter alia:* (1) It is the constitutional right of every one whose property is taken for public use to have the compensation therefor paid or, in case a municipal corporation is the taker, to have an adequate fund provided by law for such payment, at the time of or prior to the actual taking. *Powers v. Bears,* 12 Wis. 214; *Loop v. Chamberlain,* 20 Wis. 135; *Sherman v. M., L. S. & W. R. Co.* 40 Wis. 645; *Brock v. Hishen,* 40 Wis. 674; *Smeaton v. Martin,* 57 Wis. 364, 15 N. W. 403; *State ex rel. Andrews v. Oshkosh,* 84 Wis. 548, 54 N. W. 1095; *Norton v. Peck,* 3 Wis. 471; 2 Lewis, Em. Dom. (2d ed.) 452, 453*a;* 15 Cyc. 645; *Rent v. Emery,* 173 Mass. 455, 53 N. E. 910. The only statute making such provision is ch. 665, Laws of 1907, passed contemporaneously with the Public Utilities Law and evidently intended to supplement it. Said ch. 665 allows an intelligent vote by the electors at the same time upon both the purchase of a plant and the manner of payment, and its provisions should have been complied with. (2) The duty of formulating a question for submission to the electorate and directing the manner as well as the time of submission is legislative in character and, if not performed by the legislature itself, rested with the common council and not with the clerk; and the particular question submitted was not only unauthorized but was misleading and not in compliance with the

statute which requires submission of the purchase of a *specific* plant.    It did not refer to the plant of the *Racine Water Company* at all and may well have been understood by the voters as meaning, Shall the city acquire its own water works? The statute should be followed with reasonable strictness and the property to be taken should be accurately described so as to make the contract mutual and enforceable by the *Water Company.    Austin v. Allen,* 6 Wis. 134; *Babb v. Carver,* 7 Wis. 124; *Koller v. La Crosse,* 106 Wis. 369, 82 N. W. 341; *State v. Logue,* 73 Wis. 598, 41 N. W. 1061; *Strang v. B. & M. R. Co.* 16 Wis. 666; *Isham v. Smith,* 21 Wis. 32; *People ex rel. Darnell v. Hamilton Co.* 3 Neb. 244; *Athens v. Hemerick,* 89 Ga. 674, 16 S. E. 72; *Crooke v. Daviess Co.* 36 Ind. 320; *Yarish v. C. R., I. F. & N. W. R. Co.* 72 Iowa, 556, 34 N. W. 417; *Ashland v. C. & N. W. R. Co.* 105 Wis. 398, 80 N. W. 1101; *Ashland v. N. P. R. Co.* 119 Wis. 204, 96 N. W. 688.    (3) The use of voting machines violated the constitutional provision that all elections must be "by ballot." *State ex rel. Runge v. Anderson,* 100 Wis. 523, 76 N. W. 482; *State ex rel. Briesen v. Bardeen,* 77 Wis. 601, 46 N. W. 899; *Opinion of Justices,* 178 Mass. 605, 60 N. E. 129; *Nichols v. Minton,* 196 Mass. 410, 82 N. E. 50; *People ex rel. Deister v. Wintermute,* 194 N. Y. 99, 86 N. E. 818; *State ex rel. Karlinger v. Board, etc.* 80 Ohio St. 471, 89 N. E. 33; *State v. Miller,* 87 Ohio St. 12, 99 N. E. 1078, 1084. (4) The vote, if valid, would amount to an acceptance of the city's option to purchase, existing by virtue of the indeterminate permit, and would therefore create an immediate obligation or debt on the part of the city.    *Appleton W. W. Co. v. Railroad Commission,* 154 Wis. 121, 142 N. W. 476; *Cherryvale W. Co. v. Cherryvale,* 65 Kan. 219, 69 Pac. 176; *Bristol v. Bristol & W. W. W. Co.* 25 R. I. 189, 55 Atl. 710; *Braintree W. S. Co. v. Braintree,* 146 Mass. 482, 16 N. E. 420; *Rockport W. Co. v. Rockport,* 161 Mass. 279, 37 N. E. 168; *Galena W. Co. v. Galena,* 74 Kan. 644, 87 Pac. 735;

*Crogster v. Bayfield Co.* 99 Wis. 1, 74 N. W. 635, 77 N. W.
167; *Earles v. Wells,* 94 Wis. 285, 298, 68 N. W. 964; *Cul-
bertson v. Fulton,* 127 Ill. 30.   (5) Because such indebted-
ness would exceed the constitutional limit of five per cent. of
the *then* assessed value of the taxable property of the city, the
city was without power to buy and the vote was of no effect.
*Crogster v. Bayfield Co., supra.*   (6) The city waived its
right to purchase by ordering extensions after the vote was
taken.   *Rockport W. Co. v. Rockport, supra; Bristol v. Bris-
tol & W. W. W. Co., supra; Galena W. Co. v. Galena, supra.*
(7) The law must be interpreted in the light of the constitu-
tion.   It provides the same procedure in cases where the
utility has *not* accepted an indeterminate permit as where it
has, except as to the trial by jury of the question of neces-
sity.   Hence no other constitutional rights are waived, and
the railroad commission can impose no "terms or conditions"
which invade such rights.

   *E. R. Burgess* and *Burr W. Jones,* for the respondents,
contended that sec. 1797*m*—80, Stats. 1911, governed in re-
spect to the submission of the question of purchase to the
electors; that it was complete and sufficient in itself; and
that ch. 665, Laws of 1907, was an independent statute, the
main purpose of which was to provide for the construction
or purchase of plants by the use of mortgage certificates.
*Appleton W. W. Co. v. Appleton,* 116 Wis. 363, 93 N. W.
262.   The use of voting machines was legal.   *Henshaw v.
Foster,* 26 Mass. 312; *In re Voting Machine,* 19 R. I. 729,
36 Atl. 716; *Detroit v. Board of Inspectors,* 139 Mich. 548,
102 N. W. 1029; *Henderson v. Board of Elec. Comm'rs,*
160 Mich. 36, 124 N. W. 1105; *Elwell v. Comstock,* 99
Minn. 261, 109 N. W. 698; *Lynch v. Malley,* 215 Ill. 574,
74 N. E. 723.   The statute imposed no condition requiring
the ability of the city to buy to be determined, or the funds to
pay for the plant to be provided, in advance of a valuation;
and the *Water Company* by accepting an indeterminate per-

mit accepted the provisions of the statute. *In re Cedar Rapids,* 85 Iowa, 39, 51 N. W. 1142. When the valuation is completed, the duty of the city to pay by the levy of a tax or the issue of bonds is just as imperative as if the mandate had been written in the law. *Smith v. Gould,* 59 Wis. 631, 18 N. W. 457; *State v. Hogue,* 71 Wis. 384, 36 N. W. 860; *State ex rel. Burbank v. Superior,* 81 Wis. 649, 51 N. W. 1014; *Haubner v. Milwaukee,* 124 Wis. 153, 101 N. W. 930, 102 N. W. 578; *Williams v. Parker,* 188 U. S. 491, 23 Sup. Ct. 440; Lewis, Em. Dom. § 679. The proceeding is not a condemnation but a purchase, and the *Water Company* by accepting an indeterminate permit has waived the objections now urged. *Appleton W. W. Co. v. Railroad Commission,* 154 Wis. 121, 142 N. W. 476. It would be impossible to provide for the payment, by tax levy or otherwise, and hence there could be no debt, within the meaning of the constitution, until the price was ascertained. *Eau Claire v. Eau Claire W. Co.* 137 Wis. 517, 119 N. W. 555; *Kyes v. St. Croix Co.* 108 Wis. 136, 83 N. W. 637; *Eau Claire W. Co. v. Eau Claire,* 132 Wis. 411, 112 N. W. 458; *State ex rel. Marinette, T. & W. R. Co. v. Tomahawk,* 96 Wis. 91, 71 N. W. 86; *Eau Claire W. Co. v. Eau Claire,* 127 Wis. 154, 106 N. W. 679.

VINJE, J.   Briefly summarized, the material contentions of appellants are: (1) The provisions of ch. 665, Laws of 1907, should have been complied with in acquiring the plant and in submitting the question of the purchase thereof to the voters; (2) the question of acquiring the plant was improperly submitted to the voters, because (a) the city clerk had no authority to frame the question to be submitted, and (b) the question as framed was misleading; (3) the vote was illegal because voting machines were used; (4) the city should have provided a fund for the payment of the plant before the vote to purchase was taken; (5) the city's constitutional limit of

indebtedness was or will be exceeded by the purchase; (6) the city has not and cannot comply with the constitutional requirement that before or at the time of incurring any indebtedness it shall provide for the collection of a direct annual tax sufficient to pay the same as therein provided; and (7) the city, by reason of ordering extensions to be made to the plant after it voted to purchase the same, is estopped from further prosecuting the proceedings.

1. Was it necessary to comply with the requirements of the provisions of ch. 665, Laws of 1907, in acquiring the plant and in submitting the question of the purchase thereof to the voters? If it was, then the proper proceedings were not taken, for ch. 665 requires that the resolution or ordinance authorizing the construction or acquisition of a plant shall prescribe the parts of the expense of such acquisition or purchase to be paid out of the general fund of the city, or from the proceeds of bonds issued pursuant to law, or from the proceeds of mortgage certificates, as therein provided. Sec. 927—12, Stats. 1911. It also requires that the notice of election for the acquisition or purchase of the plant shall state, among other things, the proposed manner of payment for the same. Sec. 927—14, Stats. 1911. And sec. 927—15 thereof provides that the form of the question submitted to the voters shall be substantially as follows: "Shall (designate plant, equipment or part thereof) be acquired or constructed and mortgage certificates ( (and) (or) bonds) be issued therefor? Yes ☐   No ☐." It will be observed from these requirements of ch. 665 and the proceedings taken by the city as set out in the statement of facts that ch. 665 was not complied with. Ch. 665 was approved July 16, 1907, and published the next day. The general Public Utility Law (ch. 499, Laws of 1907) was approved July 9, 1907, and published July 11, 1907. It is claimed by appellants that these two laws furnish but a single complete method of acquiring public utilities by cities, and that

they supplement each other. The respondents claim that they are independent acts and that proceedings may be had under the one or the other as they may apply to the situation confronting cities in the acquisition or construction of public utilities. Ch. 499, Laws of 1907, is the general Public Utility Act and is found in the Statutes of 1911 in ch. 87, entitled "Railroads," constituting secs. $1797m$—1 to $1797m$—109, inclusive, while ch. 665, Laws of 1907, is found in ch. 41 thereof, entitled "General Provisions Relating to Municipalities, Including Cities of Both Classes," and constitutes secs. 927—11 to 927—19, inclusive.

The provisions for acquiring a public utility under the general acts are found in secs. $1797m$—80 to $1797m$—86, with a curative provision added in 1911 as sec. $1797m$—86m. They nowhere require, either in the resolution or ordinance of the council, in the notice of election, or in the question submitted, that the manner of providing the fund shall be specified. It is obvious that if ch. 665 applies to the acquisition of a public utility under secs. $1797m$—80 to $1797m$—86, inclusive, it must be reasonably adapted to apply to and meet the situations therein contemplated. For it is impossible to believe that the legislature, having under consideration both these acts at the same time and intending them to be supplementary to each other, should include provisions in ch. 665 that could not reasonably be complied with in the acquisition of a public utility under the general act. And yet, if the acts are supplementary, that is just what the legislature did. By the general act the railroad commission must fix the amount of property to be purchased, the price thereof, and the terms and conditions of the payment. Sec. $1797m$—82. Until this is done the city cannot know what amount of money it must pay for the plant nor the terms and conditions of the payment. Such determination cannot be made by the railroad commission until after the city is required to act both by its council and its electors.

It would therefore be unreasonable to require the city council and the voters to determine what part of the expense should be paid out of the general fund, what part from the proceeds of bonds, and what part from the proceeds of mortgage certificates, before they knew the amount to be raised. True, the word "part" denotes proportion or ratio merely and not absolute amount. But it does not seem reasonable to require a city to determine in what proportion it will raise funds before it knows the amount of funds to be raised. Moreover, the railroad commission must fix the terms and conditions of the sale, and they may be important factors in properly determining how the funds shall be provided. But that ch. 665 contemplated that the amount of money to be raised was known before the city was required to act, and that the amount of each *part* should be specified in the resolution, or ordinance, notice of election, and question to be submitted to the voters, is rendered almost certain by the language of sec. 927—17, which requires the mayor and clerk of the city, in case mortgage certificates are called for in the ordinance or resolution, notice of election, and question submitted to the voters, to issue mortgage certificates *"for the purpose and to the amount stated."* The words *amount stated* can refer only to the amount stated in such ordinance or resolution, notice of election, and question submitted to the voters.

Ch. 665 furnishes in itself a complete procedure for acquiring a public utility in cases where it is applicable, and so does the general Public Utility Act. Neither refers to the other. Each uses expressions equivalent to "as herein provided," and does not seem to contemplate the aid of supplementary statutes in completing the proceeding. The language of sec. 1797m—81 to the effect that if the city shall have determined to acquire an existing plant "in the manner provided in the preceding section," clearly indicates that no other procedure than that contained in the section referred to was in the legislative mind. So the language in sec.

927—11 that any city may construct or acquire a plant "as herein provided," and that it must comply with certain specified requisites before it does so "under this section," clearly indicates that ch. 665 was considered complete and independent by the legislature. It required the question of purchase to be submitted to the voters. The Public Utility Law as first enacted did not so require, but was amended in 1911 so as to require it. No reference in such amendment was made to ch. 665, and if all proceedings had to comply with the latter no amendment was necessary.

A careful study of ch. 665 leads to the conclusion that the primary purpose of its enactment was to enable cities to construct or purchase plants by the issue of mortgage certificates. Bonds and cash were also included to make it more elastic. It seems peculiarly adapted to the construction or acquisition of plants under sub. 1 and 2 of sec. 1797m—79, which provide for the construction, equipment, and operation of a plant by a municipality, and the purchase of any part of any plant by an agreement with a public utility, respectively. Both deal with situations where the amount to be raised can be definitely ascertained. The procedure of the general Public Utility Act seems more applicable to the acquisition of a plant under sub. 3 and 4 of said sec. 1797m—79, which provide, respectively, for the acquisition of a plant by condemnation and by purchase pursuant to the Public Utility Law, where the amount to be raised cannot be definitely ascertained until long after the municipality is required to vote on the subject.

The conclusion reached is that the city properly began proceedings under the general Public Utility Law, and that it was not necessary to comply with the provisions of ch. 665, as that is an independent act.

2. Was the question of acquiring the plant improperly submitted to the voters? The city council passed a resolution providing for the submission to the voters of the question

of "purchasing the *Racine Water Company* plant." It appears that the city council did not determine in what particular form the question should be submitted to the voters, nor direct the city clerk to prepare the question. The latter, however, prepared a notice of election announcing that the question, "Shall the city of *Racine* purchase its water works," would be voted upon at the ensuing spring election, and such was the form of the question voted upon.

Appellants claim (a) that the city clerk had no right to determine the form of the question, that being the duty of the council, and (b) that the form of the question was misleading, and was not equivalent to a vote upon the question of whether the city should purchase the *Racine Water Company's* plant. It is needless to consider or determine the power of the city clerk, in the absence of any directions from the council, to prepare the form of the question, for it appears that on the 2d day of May, 1911, the council passed a resolution reciting that the city of *Racine* by a vote of the majority of the electors voting thereon had determined to purchase the Racine water works plant. The passage of such a resolution with knowledge of all the facts was a ratification of the city clerk's acts in preparing the question for the voters. What the council could do in the first instance respecting this matter it could subsequently ratify.

The claim that the voters were misled by the form of the question is not well founded. The evidence fails to disclose that there was more than one water works plant in *Racine,* and in view of the public discussion of the question previous to election of the purchase of the *Racine Water Company's* plant, as found by the court, it must be apparent that such plant was meant and understood by the question "Shall the city of *Racine* purchase its water works?" No voter was misled. There was only one plant subject to purchase, and that was the one in fact voted for, namely, the *Racine Water Company's* plant.

In *State ex rel. Elliott v. Kelly,* 154 Wis. 482, 143 N. W. 153, it was held that a vote for the office of "chamber of commerce" was a vote for the office of "superintendent of trade and commerce," because the voters were not misled by the difference in terms. The reasons for holding that no one was misled are much stronger in this case.

3. The question of whether or not votes cast by means of voting machines are votes "by ballot" within the meaning of sec. 3, art. III, of the constitution, which requires that "All votes shall be given by ballot except for such township officers as may by law be directed to be otherwise chosen," is an interesting one. The Massachusetts court divided on it. See *Opinion of Justices,* 178 Mass. 605, 60 N. E. 129. Their constitution, however, requires that the voting, there construed, should be by "written vote." Michigan, in *Henderson v. Saginaw Elec. Comm'rs,* 160 Mich. 36, 124 N. W. 1105; Illinois, in *Lynch v. Malley,* 215 Ill. 574, 74 N. E. 723; and Minnesota, in *Elwell v. Comstock,* 99 Minn. 261, 109 N. W. 113, 698, have held votes by voting machines valid under constitutional provisions similar to our own, while Ohio, in *State ex rel. Karlinger v. Board,* 80 Ohio St. 471, 89 N. E. 33, and reaffirmed in *State ex rel. Weinberger v. Miller,* 87 Ohio St. 12, 99 N. E. 1078, held them void.

We deem it unnecessary to decide the question in this case, for the reason that it was entirely within the discretion of the legislature to grant to or withhold from the electors the right to vote on the subject of the construction or acquisition by a municipality of water works. Having granted the right, it could attach to it the reasonable condition that the vote should be in the form prescribed by statute. Secs. 44—1 to 44—18, Stats. 1911, provide for the use of voting machines. It does not appear that any of the requirements therein contained were violated. Hence it must be held that a valid vote was had on the question of the purchase of the plant.

4. The contention that sec. 13, art. I, of the constitution, providing that "the property of no person shall be taken for public use without just compensation therefor," required the city to provide a fund for the payment of the plant before voting to purchase, is untenable for two reasons. In the first place, conceding for the purposes of the argument that the taking of the vote was an election to condemn, the rule that a fund must be provided beforehand for the payment of the property taken does not apply to municipal corporations, because it has been held that the taxable property of the municipality constitutes a sufficient pledge or fund for the making of the just compensation contemplated by the constitution. *Smeaton v. Martin,* 57 Wis. 364, 15 N. W. 403; *Smith v. Gould,* 59 Wis. 631, 18 N. W. 457; *State v. Hogue,* 71 Wis. 384, 36 N. W. 860; *Kimberly & C. Co. v. Hewitt,* 79 Wis. 334, 48 N. W. 373; *State ex rel. Burbank v. Superior,* 81 Wis. 649, 51 N. W. 1014; *Haubner v. Milwaukee,* 124 Wis. 153, 167, 101 N. W. 930, 102 N. W. 578. That the taxable property of the municipality is liable for any valid debt created by it is guaranteed by the mandate of the constitution itself requiring the levy of a direct annual tax sufficient to pay the principal and interest within twenty years. Sec. 3, art. XI.

In the second place, the acquisition of the plant by the city is not a condemnation but a purchase under the terms and conditions prescribed by the Public Utility Law. Sec. 1797m—78 provides:

"Any public utility accepting or operating under any license, permit or franchise hereafter granted shall, by acceptance of any such indeterminate permit, be deemed to have consented to a future purchase of its property actually used and useful for the convenience of the public by the municipality in which the major part of it is situate for the compensation and under the terms and conditions determined by the commission, and shall thereby be deemed to have waived the right of requiring the necessity of such taking to be es-

tablished by the verdict of a jury, and to have waived all other remedies and rights relative to condemnation, except such rights and remedies as are provided in secs. $1797m$—1 to $1797m$—109, inclusive."

By accepting the indeterminate permit the *Racine Water Company* stipulated to sell its property to the city under the terms and conditions contained in the Public Utility Act as supplemented and safeguarded by the constitution of the state. This it was competent to do, and this it did by accepting an indeterminate permit. We are therefore called upon only to see that the provisions of such act and of the constitution are complied with in the making of the purchase.

5. Appellants claim that two constitutional provisions, found in sec. 3, art. XI, incapacitate the city from making the purchase. The first reads: "No . . . city . . . shall be allowed to become indebted in any manner or for any purpose to any amount, including existing indebtedness, in the aggregate exceeding five per -centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness." The second provides: "Any . . . city . . . incurring any indebtedness as aforesaid shall, before or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same." Their claim is that when the city voted to purchase the plant on April 4, 1911, it incurred the indebtedness within the meaning of the first constitutional provision above quoted, though the amount of the indebtedness remained to be determined later by the railroad commission. At the time the vote was taken the previous assessment of the city was $24,464,231; its indebtedness was $664,000. The tentative value of the plant was fixed at $775,000. If the tentative value of the plant be taken as the amount of the debt, then

that amount, added to the indebtedness of the city, would exceed five per centum of the assessed valuation by over $200,000, and the city could not lawfully make the purchase if the debt is held to be incurred when the city votes to buy.

The method of acquiring a public utility under the statute is a complex one. Between the time the option to purchase is exercised by the city and the time it takes actual possession of the acquired utility a considerable period of time must necessarily elapse and much work must be done by the railroad commission. It is given a year in the first instance within which to complete its labors after notice is served upon it by the city. Sec. 1797m—82. The proceeding is *sui generis,* and but little aid can be had from adjudicated cases in determining when, under the provisions of the statute, the city incurs the indebtedness within the meaning of the constitutional provision first above referred to. It is evident that at the time the vote is taken to acquire the plant only a rough guess or estimate can be made of the total amount that may finally have to be paid therefor, because, pursuant to the law, the railroad commission must determine the quantum of property to be taken, the price to be paid therefor, and the terms and conditions under which the purchase price shall be paid. And sec. 1797m—82 says: "The compensation and other terms and the conditions of sale and purchase thus certified by the commission shall constitute the compensation and terms and conditions to be paid, followed, and observed in the purchase of such plant from such public utility;" and further, "Upon the filing of such certificate [containing the price and terms of sale] with the clerk of such municipality the exclusive use of the property taken shall vest in such municipality." It is evident from this language of the statute that up to the time the certificate is filed the public utility exercises full control over its property the same as it did before the city elected to purchase. The statute nowhere prescribes when the title to the property shall vest in the munici-

pality. But it is evident from the provisions of the act taken collectively as well as from specific language in particular sections that the transaction for the purchase of the plant is not deemed complete in all its essential details until the railroad commission files its certificate. Then the exclusive use of the plant is transferred to the municipality, and if payment is not then made interest must be allowed in order that the purchase price shall constitute just compensation. *Appleton W. W. Co. v. Railroad Commission,* 154 Wis. 121, 142 N. W. 476. Up to that time the public utility exercises full control over its property the same as it did before the city elected to purchase. It is true that in the *Appleton Case, supra,* the court said: "The moment the municipality exercises its option to purchase the plant of a public utility operating under such a permit [an indeterminate one] the life of such permit is terminated, and henceforth the same possesses no more value than a franchise for a definite term of years upon the expiration of the term." But that was stated with reference to the question of whether or not the public utility should be allowed compensation for the alleged value of the indeterminate permit. It was not thereby intended to determine or fix the precise time the city incurred a debt in the purchase of a public utility. The language used was apt and appropriate to the subject then discussed by the court, but it has little relevancy to the question now under consideration.

In a case where the probable value of the plant intended to be purchased, together with the indebtedness of the city, approximates or slightly exceeds the constitutional amount of indebtedness a city may incur, it can never be accurately determined until the railroad commission files its certificate whether or not the five per centum limit of indebtedness is exceeded. To hold that the amount of the purchase price when ascertained by the railroad commission relates back and constitutes an indebtedness from the time the vote is taken

might in many cases result in invalidating obligations apparently lawfully incurred by the city during the interval that elapses between the time the vote is taken and the time the railroad commission fixes the amount of the purchase price. Moreover, it would result in holding the city presently indebted for a plant which is still being operated by a public utility, and which in all probability will continue to be so operated for a considerable length of time, the profits of which operation will accrue to the public utility. On the other hand, if it be held that the indebtedness is incurred, and the obligation to pay becomes fixed, when the certificate is filed, and when the exclusive use of the property, and presumably the title also, vests in the municipality, then it can always be ascertained with exactness at the time the debt is incurred whether or not the constitutional provision above referred to is violated. Upon reflection it becomes plain that the amount of the debt must be ascertainable at the time the constitution requires the municipality to determine whether it has exceeded its constitutional limit of indebtedness, and that is at the time the debt is incurred.

In *Crogster v. Bayfield Co.* 99 Wis. 1, 17, 74 N. W. 635, 77 N. W. 167, the court says:

"The limit of such indebtedness, as fixed in the constitutional provision in question, is 'five per centum on the value of the taxable property' in the county, 'to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness.' The manifest purpose of ascertaining such value of the taxable property in the county by such 'last assessment' previous to the incurring of such indebtedness was to enable all parties to know in advance whether the debt so contracted was within or exceeded the constitutional limit. In the language of Mr. Justice LAMAR, speaking for the whole court, in one of the cases cited: 'In this case the standard of validity is created by the constitution. In that standard two factors are to be considered,— one the amount of the assessed value, and the other the ratio

between that assessed value and the debt proposed.' *Lake Co. v. Graham,* 130 U. S. 683,-684, 9 Sup. Ct. 654. . . . As indicated in that opinion, the two standards of validity created by the constitution, to wit, the amount of such assessed value and the ratio between that 'value and the debt proposed,' are indispensable requisites, and must always be kept in mind in determining the validity of any such contract." Page 17.

In no case can the ratio between the assessed valuation and the indebtedness of the city, including the proposed debt, be determined until the amount of the proposed debt is known. Therefore it must be held that within the meaning of the constitution a debt is not incurred until its amount is ascertainable. Because until such amount is ascertainable it is impossible to apply the test required by the constitution, namely, the ratio between the indebtedness of the city and the last assessed valuation. It cannot be that such a test was intended to be applied before it was possible to do so. The constitution evidently contemplates that there should be a definite debt to which the test can be applied, and if there is no such definite debt it cannot be a debt within the meaning of the constitution. It is merely a debt *in fieri.* By a debt incurred the constitution means a debt whose ratio to the limit of indebtedness can be ascertained at the time it is incurred. At least it must follow that where the constitutional test cannot be applied it cannot be said the constitution is violated.

Our attention is called by appellants to a number of cases, some arising under statutory provisions and some under contracts, wherein it has been held that when a municipality agrees or contracts or elects under a statute to do a certain thing calling for the payment of money, an indebtedness is then incurred. Such cases are of little value in determining when a city incurs an indebtedness under the proceedings of the Public Utility Act. As before stated, the transactions

involved are many and are necessarily separated by long intervals of time, and it seems more logical and more in consonance with the legislative intent to hold that such indebtedness arises when the amount and terms thereof become fixed and the exclusive use of the property vests in the municipality, than to say that it is incurred at the initial step of the proceedings and long before the transactions are fully and finally consummated.

The case of *Crogster v. Bayfield Co.* 99 Wis. 1, 74 N. W. 635, 77 N. W. 167, is relied upon as authority for the proposition that the debt is incurred when the vote to purchase is taken. It will be seen in the *Crogster Case* that the county voted to issue $240,000 of bonds to aid in the building of a railroad. If both parties fulfilled their contract, the exact amount of the indebtedness was known when the vote was taken and the debt was held to be incurred. Not so in the instant case. Besides, in the *Crogster Case* the statutory provisions were different. That statute (sec. 945, R. S. 1878) expressly provided for the execution by the railroad company under its seal of a definite proposition in writing to be by it delivered to the municipality. All the terms and conditions were fixed. The next section provided two different ways in which the definite proposition might be accepted by the municipality "so as to become mutually obligatory;" one by signature, the other by an election. No matter in which way it was accepted, the statute declared that if accepted "then such proposition shall be deemed obligatory as a mutual agreement." We have no such statute under consideration in the present case. Quite the contrary appears, as has been indicated. The final consummation of the proceedings is not reached till the railroad commission files its certificate. Then the terms and the mutual agreement become fixed, then the public utility furnishes the consideration for the debt, and then the debt is created within the meaning of the constitution. *Merrill R. & L. Co. v. Merrill,* 80 Wis. 358, 49

N. W. 965; *Walla Walla v. Walla Walla W. Co.* 172 U. S. 1, 19 Sup. Ct. 77. The last assessment previous to the filing of such certificate will govern. Since the assessment of 1912 was over $50,000,000, it must be presumed that the city will not exceed its constitutional limit of indebtedness in purchasing the plant.

6. Can the constitutional provision requiring the city to provide for the collection of a direct annual tax to pay the indebtedness created by the purchase of the plant be complied with under the provisions of the statute? It is true the act nowhere contains any specific direction for its being done, nor any provision for doing it. There was no necessity for the statute providing that it should be done, for the constitutional requirement is paramount and must be read into the law, whether expressed therein or not. It would certainly, however, have been appropriate for the legislature to have provided in specific terms for the opportunity of the city to do so. Whether such omission was due to an oversight or to the fact that the legislature considered that by intrusting the proceedings to such an important state agency as the railroad commission ample opportunity would by it be given the city to comply with the constitution, is immaterial. Under the law as it stands it becomes the duty of the railroad commission, after it has determined the amount of the purchase price and the terms and conditions of the sale, to notify the city of the result of its action and to give it a reasonable time after such notice and before the certificate is filed to make provision for the collection of the direct annual tax required by the constitution. And upon such notice it likewise becomes the duty of the city, within a reasonable time, to comply with the constitutional provisions. And if, in view of the terms and conditions of sale imposed by the railroad commission, it becomes necessary to issue bonds to procure the purchase price, it can do so without any further vote of the electors. Their vote to purchase the plant must be held

to include a vote to raise money by the issuance of bonds if that method be deemed necessary or expedient by the city council.

7. No estoppel against the city to consummate the proceedings arises from the fact that it ordered extensions to the system after voting to purchase the plant. Public health and convenience, as well as the statute, require that such a public utility shall give adequate service. And such service must continue during the interval that elapses between the time the city elects to purchase and the time the transactions are finally concluded by the filing of the certificate. Up to that time the plant and property belong to the public utility, and the city must pay for the plant as it exists at the time it is turned over to it, so no injustice is done the utility by requiring it to continue to give adequate service during the time the proceedings are pending.

*By the Court.*—Judgment affirmed on both appeals.