VILLAGE OF SUSSEX, Appellant, v. DEPARTMENT OF NAT-
URAL RESOURCES, Respondent.

*No. 476. Argued February 4, 1975.—Decided April 28, 1975.*
(Also reported in 228 N. W. 2d 173.)

For the appellant there was a brief by *Dale W. Arenz* and *Hippenmeyer, Reilly & Arenz,* all of Waukesha, and oral argument by *Dale W. Arenz.*

For the respondent the cause was argued by *Robert B. McConnell,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

HEFFERNAN, J.  The Department of Natural Resources made a survey of the village of Sussex water supply and, after a hearing, found, pursuant to sec. 144.025 (2) (r), Stats., that the absence of a municipal water system tended to create a nuisance or menace to the health of the community.  It ordered the village of Sussex to prepare plans for construction of an adequate public water supply not later than September 1, 1973, and to construct a public water supply according to approved plans no later than September 1, 1974.  The village of Sussex petitioned the circuit court for Dane county for a judicial review of this order; and on December 4, 1973, the circuit court for Dane county affirmed the department's order but directed its modification in certain immaterial respects, generally for the purpose of having the order conform with the directions of ch. 227, the Administrative Procedure Act.  The circuit court also granted a one year extension of time to comply with the order.  The village has appealed from the order of the circuit court affirming the Department of Natural Resources.

The village argues that the statute under which the department purported to act does not give it the authority to order a municipality to construct a public water system; and that, in any event, sec. 66.065, Stats., requires that a city may construct and finance a water plant only after the adoption of an initial resolution and a referendum of the electors of the municipality.  In addition, the evidentiary underpinnings of the department's order are attacked as being insufficient.

The village also argues that the portion of the order which requires that contaminated wells be sealed takes the property of the private well owners without compensation, in violation of art. I, sec. 13, of the Wisconsin Constitution.

We conclude that, in respect to each of these propositions, the village's position is not supported by the facts or sustained by the law.  We conclude that the order of the trial court must be affirmed.

It is argued that the Department of Natural Resources has no authority under ch. 144, Stats., to order the village to construct a public water system. The argument is that ch. 144 is an anti-pollution chapter. The village reasons that, because the construction of a public water system will not prevent the pollution of ground waters, the department has no statutory authority to order the construction of a municipal water system. That argument is irrelevant and flatly contradicted by the statutes.

Sec. 144.025 (2) (r), Stats., provides in part:

"If the department finds that the absence of a municipal system or plant [defined in sec. 144.01 (6), Stats., to include water systems] tends to create a nuisance or menace to health or comfort, it may order the city, village, town or town sanitary district embracing the area where such conditions exist to prepare and file complete plans of a corrective system as provided by s. 144.04, and to construct such system within a specified time."

The statute is plain and unambiguous. If, on the basis of substantial evidence, the department finds that the absence of a municipal water system tends to create a nuisance or menace to health or comfort and makes such a finding, it has legislative authority to order the planning and construction of a water system to correct that condition.

While ch. 144, Stats., is devoted, to a considerable extent, to the problems of surface and ground water pollution, the particular statute, sec. 144.025 (2) (r), is directed to the nuisance or menace that is caused by the absence of a municipal system, as that is defined in sec. 144.01 (6). Moreover, throughout ch. 144, are scattered provisions that are concerned with determining the best sources of water supply (*e.g.*, sec. 144.02 (1) (e)), and the very section in which the question at issue in this case appears is sec. 144.025 (2) (h), which gives the department supervisory authority to assist owners in respect to pure water supplies.

The village relies upon the 1956 case of *Bino v. Hurley* (1956), 273 Wis. 10, 76 N. W. 2d 571, to the effect that a village's method of supplying its inhabitants with water is a proprietary function and not governed by ch. 144, Stats. Whatever relevance proprietary-versus-governmental functions in respect to municipal activities might have had in 1956, that relevance was terminated by the case of *Holytz v. Milwaukee* (1962), 17 Wis. 2d 26, 115 N. W. 2d 618. Moreover, the dissent of Mr. Justice GEORGE R. CURRIE to the *Bino* opinion is now accepted by this court. Mr. Justice CURRIE therein properly ignored the proprietary-governmental distinction and pointed out that the whole question of property rights must be considered in a different context because:

"There is no question but that a state, or any political subdivision thereof empowered so to do by the legislature, may exercise the police power to protect the purity of the water supply of its citizens." *Bino, supra,* page 23.

The statements of Mr. Justice CURRIE, even in 1956, were not based upon new law. *State ex rel. Martin v. Juneau* (1941), 238 Wis. 564, 570, 571, 300 N. W. 187, held, ". . . there can be no question but that the promotion and protection of public health is a matter of state-wide concern."

It is apparent, therefore, that not only does the statute specifically and unambiguously give authority to the Department of Natural Resources under legislative guidelines to mandate the construction of a water system, but in addition such mandate by the legislature is within the police powers that may be exercised by the legislature.

The village also argues that, even though we were to conclude as we do that the department has the authority under sec. 144.025 (2) (r), Stats., to order the construction of a water system, the order cannot be entered, or at least made effective, until the village has conducted a referendum of the electorate under sec. 66.065, which

ordinarily is used when a municipality acquires a water, heat, light, or power plant. That referendum under sec. 66.065 (3) is designed to give the electorate the opportunity to approve the construction or acquisition of a public utility plant and to approve the method of payment. While sec. 66.065 outlines the procedure by which villages may engage in the water utility business and provide a mode of payment, that statute does not limit the state or the legislature. A municipal corporation is a creature of the legislature, and aside from its substantial constitutional home rule powers, which are not at issue here, the legislature may, in its wisdom and at its convenience, direct alternative methods by which a municipal corporation may construct a public facility and, in addition, as provided in ch. 144, direct the circumstances under which a municipality shall be obligated to proceed with improvements.

Ch. 144, Stats., in its policy statement, sec. 144.025 (1), says:

"The department of natural resources shall serve as the central unit of state government to protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and private. . . . The purpose of this act is to grant necessary powers and to organize a comprehensive program under a single state agency for the enhancement of the quality management and protection of all waters of the state, ground and surface, public and private."

It is apparent from this general declaration of statewide concern for the purity of all waters throughout the state that it was the legislative intent that the opinion of the local electorate, as expressed in a referendum, could not defeat the state's public policy under those circumstances where the Department of Natural Resources adheres to the procedural and substantive standards mandated by the legislature. This does not mean that sec. 66.065, Stats., is meaningless. Any town, city,

or village covered by sec. 66.065 is empowered to voluntarily construct or purchase a water utility and is obligated, in that situation, to conduct the referendum.

This court has previously pointed out that sec. 197.01, Stats., referring to the powers of municipalities under the public utility law, is in some circumstances an alternative method to sec. 66.065, Stats., for the acquisition of a public utility. *See: Wisconsin Power & Light Co. v. Public Service Comm.* (1936), 222 Wis. 25, 32, 267 N. W. 386, and *Janes v. Racine* (1913), 155 Wis. 1, 12, 143 N. W. 707.

It would appear that, in general, ch. 197, Stats., provides a method whereby a municipality may acquire, by condemnation if necessary, an existing utility or water plant. Sec. 66.065 provides a method whereby a municipality may construct a public utility on its own volition or may purchase an existing public utility as the result of negotiations. The legislature has already seen fit to provide at least two alternatives by which a municipality can acquire a water system. Sec. 144.025 (2) (r) provides a third alternative, to be exercised at the option of the state in the exercise of its police power.

Where, as here, the provisions of ch. 144, Stats., are resorted to, a referendum is unnecessary and inappropriate. As a consequence of the exercise of the state's police power, the municipality is authorized to proceed with the necessary financing and is required to comply with the order to plan, finance, and construct an adequate water system.

These powers of the Department of Natural Resources cannot be invoked unless there is substantial compliance with the legislative standards. The principal standard, and the finding which must be supported by the evidence, is that, "[T]he absence of a municipal system or plant tends to create a nuisance or menace to health or comfort." (Sec. 144.025 (2) (r), Stats.) It is the village's

contention that the evidence was not sufficient to make such finding.

The evidence shows that there were tests of the numerous private wells located in the village of Sussex from 1961 to 1971. The evidence supports the conclusion of the Department of Natural Resources that, at one time or another, approximately one third of the wells were bacteriologically unsafe. The village points out, however, that the test made in 1971 showed that only eight of the 17 wells tested were unsafe.

The standard for judicial review of the finding of the department appears in sec. 227.20 (1) (d), Stats.:

"227.20 **Scope of review. (1)** . . . The court may . . . reverse or modify [a decision] if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being:

"(d) Unsupported by substantial evidence in view of the entire record as submitted."

We conclude that the uncontradicted facts reveal substantial evidence supporting the finding and decision. There was evidence that the village was built upon a drift left as a glacial deposit overlying Niagara lime rock. The lime rock is covered by the glacial drift of varying depths of zero to one hundred feet. This lime rock, testimony showed, was badly creviced and permitted the movement of waters in the aquifer from which the private wells drew their water, without thorough filtration. All 402 private wells in the village took their water from this aquifer, which was subject to pollution. The conditions which made these wells susceptible to bacteriological contamination in fact resulted in pollution and contamination. Of 287 wells sampled in 1965, 84 were bacteriologically unsafe. In 1967, 12 of 83 wells were found unsafe. In the 1971 sample, there was not only bacteriological contamination, but contamination from petroleum. Moreover, the record appears to show that all of

the wells in the aquifer were regularly subject to bacteriological contamination, although they were not necessarily contaminated at the same time. There was testimony by an expert, a microbiologist, that bacteriologically unsafe water would be likely to carry typhoid fever, salmonella, shigella, polio, hepatitis, and parasites that could result in amoebic dysentery.

There was evidence, moreover, that even wells constructed in compliance with the administrative code requirements for the casings of wells were, nevertheless, in some instances, found to be bacteriologically unsafe.

The contamination was not in just an isolated area of the village, but, on a sampling basis, was found throughout the village. The chief of the private water supply section of the department stated that the chances of getting safe water were slim unless the water was drawn from the uncontaminated aquifer at a greater depth. He concluded that, for there to be an assurance of a safe and uncontaminated supply of water, wells had to be constructed below the Richmond shale strata to a depth of over 500 feet. There was evidence that the three public wells, which were drilled to that lower aquifer, were uniformly safe and produced uncontaminated water.

The evidence is undisputed that the absence of a municipal source of safe water created a nuisance or menace to the health of the community. The evidence also was sufficient to show that the only way to insure that the residents of Sussex would receive safe water was to construct a water system with wells dug or drilled down to the lower and uncontaminated aquifer.

While the findings of the department were not set forth in the words of the statute, the circuit judge found, on the basis of the evidence:

". . . that a public water supply system will guarantee bacterially safe water for the village residents, whereas reconstruction of private wells, even in conformance with

state standards, will not guarantee a permanent supply of uncontaminated water to village residents."

He also stated that the uncontradicted testimony ". . . proves that a serious hazard or menace to the public health exists within the village due to bacterial contamination of private wells . . . ."

At oral argument, counsel for the village was asked if he were satisfied with the adequacy of the finding, assuming *arguendo* that it was supported by the evidence. He waived any objection to the precise form of the finding. It should be noted that the mandate of the circuit court directed a remand to the Department of Natural Resources for modification to conform with requirements of sec. 227.13, Stats. While we do not have the benefit of a verbatim circuit court transcript, we assume, from this order, that a portion of the order was directed to modifying the findings of the department to conform with the ultimate fact finding, as required by the statutes: That the absence of a municipal system tends to create a menace to health. The facts were sufficient to support the finding required by sec. 144.025 (2) (r).

The village also argues that, even though the order of the department were statutorily authorized and founded upon sufficient evidence, nevertheless, the order takes the private property of the well owners, the citizens of Sussex, for public purposes without just compensation because the individual well owners are deprived of the use of their property.

In respect to the constitutional injury allegedly done to others, as stated in *Schmidt v. Local Affairs & Development Dept.* (1968), 39 Wis. 2d 46, 60, 61, 158 N. W. 2d 306:

" '. . . a party may not urge the unconstitutionality of a statute upon a point not affecting his rights. . . . we have heretofore insisted that a party must show that he

has been injuriously affected by the application of a statute before he can attack it on the grounds of unconstitutionality.' "

The village has no standing in respect to the constitutional deprivation sustained by its residents.

It is equally clear that the village, as a creature of the legislature, cannot assert constitutional rights against the state. *Kenosha v. State* (1967), 35 Wis. 2d 317, 329, 151 N. W. 2d 36; *Columbia County v. Wisconsin Retirement Fund* (1962), 17 Wis. 2d 310, 316, 116 N. W. 2d 142; *Madison Metropolitan Sewerage Dist. v. Committee* (1951), 260 Wis. 229, 50 N. W. 2d 424. The *Madison Metropolitan Sewerage Case* held that, under the provisions of ch. 144, Stats., there in question, neither a municipality nor a taxpayer could assert any constitutional rights against a legislatively created agency which was not acting in excess of its statutory powers.

We need not consider in this case the question of the constitutional rights of individuals whose wells may be capped by authority of the legislature. There has been no standing established for the assertion of those rights. It should be pointed out, however, that the case of *Huber v. Merkel* (1903), 117 Wis. 355, 94 N. W. 354, upon which the village relies to assert the unqualified property rights of a surface landowner in percolating waters, has been overruled in *State v. Michels Pipeline Construction, Inc.* (1974), 63 Wis. 2d 278, 217 N. W. 2d 339, 219 N. W. 2d 308.

Moreover, the deprivation of the use by the owners of wells that may be contaminated does not constitute a "taking" in the constitutional sense. The deprivation of use contemplated by the order of the Department of Natural Resources is exercised under the police power. The distinction between the taking under eminent domain and the exercise of police power was carefully explained by Mr. Chief Justice HALLOWS in *Just v. Marinette County* (1972), 56 Wis. 2d 7, 16, 201 N. W. 2d 761:

" '. . . it may be said that the state takes the property by eminent domain because it is useful to the public, and under the police power because it is harmful . . . . From this results the difference between the power of eminent domain and the police power, that the former recognizes a right to compensation, while the latter on principle does not.' Thus the necessity for monetary compensation for loss suffered to an owner by police power restriction arises when restrictions are placed on property in order to create a public benefit rather than to prevent a public harm."

Under the order of the Department of Natural Resources, only those private wells which have tested bacteriologically unsafe are required to be abandoned and sealed. This restriction is placed upon the wells to prevent a harm to the public. Accordingly, the owners are not entitled to compensation because of the sealing or capping of their wells.

We conclude that the order issued was within the statutory authority conferred upon the Department of Natural Resources, that the order is supported by the evidence, and that the execution of the order will not take property without just compensation.

We conclude, moreover, that, because of the specific authority conferred by the statute, the village of Sussex is authorized, pursuant to a required public purpose, to raise funds by taxation or by bonding to pay for the required water system without conducting the referendum prescribed by sec. 66.065, Stats.

*By the Court.*—Order affirmed.

DAY, J., took no part.