# CASES DETERMINED

## January Term, 1898.

CROGSTER, Appellant, vs. BAYFIELD COUNTY and others, Respondents.

*February 11 — March 22, 1898.*

*Constitutional law: Limitation of municipal indebtedness: Bonds in aid of railroad: Entire and severable contracts: Consideration.*

1. To ascertain the amount of indebtedness which a municipal corporation may incur in addition to that already existing, within the limit of five per centum upon the value of its taxable property, as fixed by sec. 3, art. XI, Const., the amount of cash on hand, and its available assets and resources easily convertible into cash to meet the payment of such liabilities when they become due, are to be subtracted from such existing indebtedness.

2. If a contract between a county and a railway company, for the issuing of bonds in aid of such company in excess of five per cent. on the value of its taxable property, is an entire contract, all bonds issued under it are absolutely void. The court cannot scale it down to an amount which the county might legally issue.

3. A contract entered into by the acceptance by a county of a proposition by a railroad company to build a railroad in six distinct sections, for each section of which the county is to issue its bonds of particular numbers, and upon the completion of such section or of a succeeding section the county is to deliver to the company the bonds issued for that section, in return for an equivalent amount of stock, is not entire but severable, and bonds so issued, not in excess of the constitutional limitation, will be valid.

4. A proposition submitted to a county by a railroad company in that form is a " definite proposition," within the requirements of secs. 943–948, R. S. 1878, specifying when the bonds shall be delivered with reference to the time of the complete construction of the

VOL. 99 — 1

railroad from point to point; and bonds issued in conformity to such proposition, and not in excess of the constitutional limitation, will in that respect be valid.

5. Such a proposition by a railroad company, when accepted by the county, becomes an indebtedness of the county, within the meaning of the constitutional limitation, and will be deemed to have been incurred at the date of the contract, and not at the time of the completion and acceptance of the work.

6. The issuing by the railroad company of its certificates of stock and depositing the same in escrow, in accordance with such contract, is a good consideration for the issuing by the county of its bonds and agreeing to deposit and pay the same, and each party thereby becomes irrevocably bound by the contract.

7. The constitutional limitation of five per centum is based upon the last assessment preceding the incurring of the indebtedness, and not upon that last preceding the completion of the work. *State ex rel. M., T. & W. R. Co. v. Common Council of Tomahawk,* 96 Wis. 73, overruled. WINSLOW, J., dissents.

8. Where the bonds of the county, in such a case, are issued to the "railroad company, its successors or assigns," the county cannot escape liability merely because the company has transferred to another all its interest in the bonds to be earned on the completion of certain sections of the railroad.

APPEAL from a judgment of the circuit court for Bayfield county: JOHN K. PARISH, Circuit Judge. *Affirmed in part; reversed in part.*

This is an action brought by the plaintiff, as a property owner and taxpayer of the county, in behalf of himself and others, to set aside 240 bonds, of $1,000 each, issued by the defendant county in aid of the *Washburn, Bayfield & Iron River Railway Company,* and to restrain the delivery of such bonds to that company, or its assigns, on the ground that the indebtedness thereby incurred exceeds the constitutional limitation of five per cent. upon the assessed valuation of the property in the county. The defendant the *Bayfield Harbor & Great Western Railroad Company* claims to be the assignee of a portion of the rights and interest of the *Washburn, Bayfield & Iron River Railway Company* in and

to such bonds, and as such filed an answer in the case. The other defendants severally answered in the case.

The following facts are undisputed or found by the court:

On August 9, 1895, a proposition was made, in writing, to the county of *Bayfield*, as required by sec. 945, R. S. 1878, for a subscription to the capital stock of the defendant *Washburn, Bayfield & Iron River Railway Company*, in aid of said railway, upon the route and between the points therein prescribed, said railway to be completed on or before December 1, 1898, and to be constructed in six several sections, as hereinafter stated, and each section to be of standard gauge. The county subscribed for $240,000, at par value, of the capital stock of said *Iron River Railway Company*, payable in negotiable bonds of the county, to be issued according to law, for the purpose of paying for such subscription, to wit, 240 bonds, numbered, consecutively, from 1 to 240, both inclusive. Each bond was to be for $1,000, dated October 1, 1895, payable in twenty years after date, and bear interest at five per cent. per annum from the date thereof until paid.

The first section of said railway should commence at Washburn, and should extend from thence northwesterly to a point distant therefrom ten miles, measured along the railway line towards the junction point on or near section 19, and for which, when completed as proposed, the railway company, its successors and assigns, was to receive fifty-five of such bonds, numbered from 1 to 55, inclusive, as the first instalment thereof. The second section of the railway should commence at the northwest end of the first section, and extend thence northwesterly to the junction, and for which, when the third section should be completed as proposed, the *Iron River Railway Company*, its successors or assigns, was to receive forty-five of such bonds, numbered from 56 to 100, inclusive, as the second instalment thereof. The third section of the railway should

commence at Iron River, and extend thence northeasterly ten miles, measured along the railway line towards the junction point, and for which, when the fifth section should be completed as proposed, the *Iron River Railway Company*, its successors or assigns, was to receive thirty of such bonds, numbered from 101 to 130, inclusive, as the third instalment thereof. The fourth section of the railway should commence at the northeast end of the third section, and extend thence northeasterly to the junction point, and for which, when the second section should be completed as proposed, the *Iron River Railway Company*, its successors or assigns, was to receive forty-two and one-half of such bonds, numbered from 131 to $172\frac{1}{2}$, inclusive, as the fourth instalment thereof. The fifth section of the railway should commence at Bayfield, and extend thence northwesterly twelve miles, measured along the railway line towards the junction point, and for which, when the fourth section should be completed as proposed, the *Iron River Railway Company*, its successors or assigns, was to receive forty-two and one-half of such bonds, numbered from 173 to 215, inclusive, as the fifth instalment thereof. The sixth section of the railway should commence at the northwest end of section five, and extend along the line of the railway to the junction point, and for which, when that section should be completed as proposed, the *Iron River Railway Company*, its successors or assigns, was to receive twenty-five of such bonds, numbered from 216 to 240, inclusive, as the sixth instalment thereof.

Said bonds should be delivered to the *Iron River Railway Company*, its successors or assigns, with reference to the time of the completion of the railway from point to point, in the manner indicated. The contract for the building of each of such sections should be deemed separate and distinct, subject, however, to the terms and conditions above specified. Whenever any section should be completed and operated as stated, the *Iron River Railway Company*, its

successors or assigns, should be entitled to and should receive the bonds for such section to the amount as above stated. In consideration of the execution and delivery of the bonds, the *Iron River Railway Company* should issue and deliver to *Bayfield* county 9,600 shares of the capital stock of that railway company, of the par value of $25 each, being a sum in all equal, at the par value of such stock, to the principal sum of said bonds, which should be delivered to the county treasurer of the county, or to the trustee thereinafter named, for the use of the county, at the same times and in like amounts as deliveries should be made of the bonds to the railway company, its successors or assigns. The stock and bonds so issued should be deposited in escrow with the Illinois Trust & Savings Bank, as trustee, or with such other trustee as should be agreed upon, within thirty days after demand therefor by the railway company, its successors or assigns; and whenever said railway company, its successors or assigns, should have earned or become entitled to the bonds on any of the sections of the railway, as above provided, the trustee should deliver them to the company, its successors or assigns, forthwith, on being tendered certain certificates for an equal amount of the capital stock of the railway company. The fact of construction, completion, and operation of any section might be proved by a resolution of the county board of the county, or in any other manner, provided that each time of the delivery of any of the bonds the interest should be canceled and marked paid on the proper coupons, to the end that the county should not be liable to pay any interest on any of the respective bonds, except from the time when the same should be earned and delivered as so agreed.

On September 17, 1895, an election was duly called and held at the usual places of holding elections in the county, at which a majority of all lawful votes cast was in favor of the proposition so submitted to the county. November 12,

1895, the county board subscribed for the capital stock of the *Washburn, Bayfield & Iron River Railway Company* in the sum of $240,000, and thereupon the county duly executed its corporate bonds to that amount, of $1,000 each, with interest coupons attached thereto, and January 12, 1896, placed the same in escrow with the *Milwaukee Trust Company*, in accordance with the terms of the proposition.

On September 19, 1896, the *Iron River Railway Company* executed and delivered to the defendant *Bayfield Harbor & Great Western Railroad Company* an assignment, in writing, whereby it, for good and valuable considerations, duly assigned, transferred, and set over to that company all the rights, privileges, title, and interest which it held and possessed in and to the subscription and bonds of the county pertaining to or to be earned by the construction of the fifth and sixth sections of the railway mentioned, together with the rights and privileges of constructing such railway over and through such fifth and sixth sections, so as to earn and be entitled to receive the $30,000 of bonds provided for the construction of the fifth section, and also the $25,000 of bonds provided for the construction of the sixth section, or any or either part of the amount of such bonds, subject to the terms and conditions set out in said instrument of assignment.

Such subscription of the county to the capital stock of the *Iron River Railway Company*, and the issue and delivery of such bonds by the county, and the placing of the same in escrow, and the assignment to the *Western Railroad Company*, were in good faith and without fraud. The organization of the *Iron River Railway Company* was in good faith, and for the purpose of building and operating a public highway for the transportation of freight and passengers, and not otherwise. The proposition, subscription, and issue of bonds, and the building of the railway, were and are entered into and carried on in good faith, and not for the pur-

Crogster vs. Bayfield County and others.

pose of defrauding the county or any of its taxpayers. The value of the taxable property in the county, as shown by the assessments of all the towns as returned to the county clerk on or before the fourth Monday in August, 1895, for the year 1895, amounted in the aggregate to $5,148,802.39. Five per centum of such amount was $257,440. The indebtedness of the county September 17, 1895, consisted of the following specified items, aside from such railway aid bonds, to wit:

| | |
|---|---|
| State loan.............................................. | $25,000 00 |
| Outstanding county orders for current expenses........... | 829 55 |
| Outstanding orders for court-house construction........... | 10 00 |
| Total .............................................. | $25,839 55 |

In addition to the above, there existed the following items, claimed by the plaintiff as indebtedness of the county:

| | |
|---|---|
| Balance due on court-house contract ...................... | $9,660 70 |
| Dues on Fish creek bridge................................ | 1,000 00 |
| Bills in justice court cases, etc .......................... | 2,089 03 |
| Other bills.............................................. | 7,487 52 |
| Due Iron River on school tax ............................ | 375 00 |
| Due Iron River on delinquent tax......................... | 9,340 17 |
| Total .............................................. | $29,952 42 |

On November 15, 1894, the county levied a tax of $36,750.98. November 13, 1895, the county levied a tax of $86,345.95. September 17, 1895, there was in the hands of the county treasurer cash belonging to the county, $6,791.79. September 17, 1895, there were in the hands of the county treasurer tax certificates belonging to the county on sale of lands in the county, $32,422.87, of the cash value of $16,000. September 15, 1895, there was due from the then county treasurer to the county certain moneys belonging to the county, which were, April 2, 1896, determined to be $9,141.17, but the same is still in litigation. September 17, 1895, there was due to the county from towns $5,168.18.

As conclusions of law from such facts the court found,

Crogster vs. Bayfield County and others.

.in effect, that the proposition, subscription for stock, issue and delivery of the bonds, and all other proceedings taken thereon, were and are in good faith and valid and binding between the parties thereto and the plaintiff and other tax-payers of the county; that the transfer and assignment to the *Bayfield Harbor & Great Western Railroad Company* were valid and binding between the parties, and entitled that company to its portion of the bonds; that the obligation entered into by the acceptance by the county of such proposition, and the indebtedness thereby incurred, did not create an indebtedness of the county in excess of the amount limited by the constitution; that the county, the county treasurer, the *Milwaukee Trust Company*, and the *Washburn, Bayfield & Iron River Railway Company* were entitled to judgment dismissing the complaint, with costs; and that the *Bayfield Harbor & Great Western Railroad Company* was entitled to judgment decreeing valid and confirming its title to all the rights, privileges, interests, and property mentioned and described in the written assignment, and judgment was ordered thereon accordingly.

From the judgment so entered the plaintiff appeals.

For the appellant there were briefs by *Tomkins & Merrill,* and oral argument by *W. M. Tomkins.* They argued, *inter alia,* that by a proper construction of the constitutional limitation, its object was to restrain the incurring of indebtedness, without regard to whether the corporation had the means of payment. Nothing, at most, except cash on hand can be set off against existing indebtedness. *Council Bluffs v. Stewart,* 51 Iowa, 385; *Litchfield v. Ballou,* 114 U. S. 190; *Doon Township v. Cummins,* 142 id. 366; *Buchanan v. Litchfield,* 102 id. 287, 288; *Fowler v. Superior,* 85 Wis. 411, 424. The contract in this case is entire,— to subscribe for $240,000 of stock of the railway company and issue bonds in payment therefor, for the purpose of constructing a railroad to connect three villages. Its purpose

Crogster vs. Bayfield County and others.

would be defeated if one link was omitted.  *Cox v. W. P. R. Co.* 44 Cal. 18; *Hedges v. Dixon Co.* 37 Fed. Rep. 304; *Millerstown v. Frederick*, 114 Pa. St. 435.  Being entire, the contract is void as a whole.

For the respondent *Bayfield & Iron River Railway Company* there was a brief by *H. H. Hayden* and *H. B. Walmsley*, attorneys, and *Davis, Kellogg & Severance*, of counsel, and oral argument by *H. H. Hayden* and *F. B. Kellogg.*

For the respondents *Milwaukee Trust Company* and the *Bayfield Harbor & Great Western Railroad Company* there was a brief by *Miller, Noyes, Miller & Wahl*, and oral argument by *G. H. Noyes.*  They contended, among other things, that the fiscal condition of the municipal corporation was to be ascertained at each different time when any instalment of bonds was earned by the completion of a section of the railroad.  *Hebard v. Ashland Co.* 55 Wis. 147; *Keystone Lumber Co. v. Bayfield*, 94 id. 491, 494; *State ex rel. M., T. & W. R. Co. v. Common Council of Tomahawk*, 96 id. 73. The debt was not incurred until then.  *Thompson Houston Electric Co. v. Newton*, 42 Fed. Rep. 723; *Seymour v. Tacoma*, 6 Wash. 427; *Childs v. Anacortes*, 5 id. 452; *Keihl v. South Bend*, 76 Fed. Rep. 921; *Rathbone v. Board of Comm'rs of Kiowa Co.* 73 id. 395, 83 id. 125.  If the issue of the whole amount would exceed the constitutional limitation, the excess only should be enjoined and the bonds be delivered according to consecutive numbers up to the constitutional limit.  *Chicago, K. & W. R. Co. v. Board of Comm'rs of Osage Co.* 38 Kan. 597; *Finlayson v. Vaughn*, 54 Minn. 331; *Citizens' Bank v. Terrell*, 78 Tex. 450; *McPherson v. Foster*, 43 Iowa, 48; *Culbertson v. Fulton*, 127 Ill. 30; *Summers v. Board of Comm'rs of Wood Co.* 27 Kan. 314; *Daviess Co. v. Dickinson*, 117 U. S. 657; *Board of Comm'rs of Lake Co. v. Standley*, 49 Pac. Rep. (Colo.), 23; *Nolan Co. v. State*, 83 Tex. 182.

CASSODAY, C. J.   1. This action was commenced Septem-
ber 22, 1896, to set aside the contract between the railway
company and the county, whereby the latter agreed to aid
the railway company to the extent of $240,000, in bonds of
$1,000 each, in exchange for a corresponding amount of
stock in the company, and to restrain the delivery of the
bonds issued and held in escrow therefor, on the ground that
the aid so voted was in excess of the constitutional limita-
tion.   Sec. 3, art. XI, Const., as amended.   That section de-
clares that " no county, city, town, village, school district,
or other municipal corporation, shall be allowed to become
indebted *in any manner or for any purpose,* to any amount
including existing indebtedness in the aggregate exceeding
five per centum on the value of the taxable property therein,
to be ascertained by the last assessment for state and county
taxes previous to the incurring of such indebtedness."   After
careful consideration, and in the light of numerous adjudica-
tions in other jurisdictions, this court has held that " so long
as the current expenses of the municipality are kept within
the limits of the moneys and assets actually in the treasury,
and the current revenues collected or in process of immedi-
ate collection, the municipality may be fairly regarded as
doing business on a cash basis, and not upon credit, even
though there may be for a short time some unpaid liabili-
ties.   In other words, a municipality's capacity for doing
business on such cash basis, with outstanding liabilities, is
necessarily measured by the amount of cash on hand, and
the available assets and resources readily convertible into
cash, to meet the payment of such liabilities as they become
due." *Earles v. Wells,* 94 Wis. 298; *State ex rel. M., T. &
W. R. Co. v. Common Council of Tomahawk,* 96 Wis. 73.
Upon this basis it appears from the facts stated that the in-
debtedness of the county, September 17, 1895, aside from
the bonds in question, and over and above the cash on hand,

and the available assets and resources readily convertible into cash to meet the payment of outstanding liabilities, was a little more than $33,000. That amount, with the $240,000 in bonds, would make $273,000. As stated, the court found that five per centum of the value of the taxable property in the county, as shown by the last assessment prior to September 17, 1895, was $257,440. If, as contended by plaintiff's counsel, the contract between the county and the railway company was an entire contract and the incurring of an indebtedness, within the meaning of the constitutional provision quoted, and if such value of taxable property in the county was to be so ascertained from such last assessment, then it is very obvious that such limit was exceeded by $15,560. Upon the theory thus assumed, there can be no question but that all the bonds so issued upon such void contract would be absolutely void. In other words, the bonds so issued upon such void contract could not be scaled down by the court to an amount which the county might thus have legally contracted to pay. *Hedges v. Dixon Co.* 150 U. S. 182; *Doon v. Cummins,* 142 U. S. 366. It would, in that event, be unlike the case where bonds were issued in excess of the amount voted by the county, and which were held valid only to the extent of the amount voted and first issued. *Daviess Co. v. Dickinson,* 117 U. S. 657.

2. The question recurs whether the proposition submitted by the railway company, and accepted by the county, constituted an entire or severable contract. As indicated, the proposition so submitted was for the construction of the ' road in six distinct sections, with bonds of particular numbers to be used in payment of each of the specified sections. The first instalment of bonds (numbered from 1 to 55, inclusive), in payment of the first section, were to be delivered when the first section should be completed; the second instalment thereof (56–100), in payment of the second section, to be delivered when the third section should

be completed; the third instalment thereof (101–130), in payment of the third section, to be delivered when the fifth section should be completed; the fourth instalment thereof (131–172½), in payment of the fourth section, to be delivered when the second section should be completed; the fifth instalment thereof (173–215), in payment of the fifth section, to be delivered when the fourth section should be completed; and the sixth instalment thereof (216–240), in payment of the sixth section, to be delivered when that section should be completed. It will be observed that the payment of the sixth instalment of $25,000 is not to be made, according to the proposition, until that section shall be completed; and hence, if that instalment should be rejected, as in excess of the constitutional limitation, upon the basis mentioned, then the first five instalments of $215,000, mentioned, and the other outstanding liabilities of $33,000, would only make $248,000, and would therefore be within the constitutional limit as found by the court.

The more difficult question is whether the statutes authorized the submission of such proposition to construct such railway in such separate and independent sections. In the statutes it is mentioned as " the proposition;" "such proposition;" "such a proposition." S. & B. Ann. Stats. secs. 943, 946. In sec. 945 it is mentioned as " a definite proposition in writing;" and which, if the subscription is to be made payable in bonds, shall specify " when said bonds shall be delivered with reference to the time of the complete construction of such railroad from *point to point;* and within what time such road shall be so constructed as to be entitled to such aid or bonds, *or any instalment thereof.*" So it is provided, in the section of the statute declaring the effect of accepting the proposition of the railway company, that " no such bonds shall be delivered, or be valid if delivered, until the road, to aid in the construction of which such bonds were voted, shall have been completed and in operation, by

the passage of cars continuously from one terminus to such *points* as such company shall have agreed to construct the same, in consideration thereof." R. S. 1878, sec. 948. After careful consideration, we are constrained to hold that the proposition submitted by the railway company was authorized by the statutes cited. Since this is so, and if we assume that the plaintiff's theory is otherwise correct, then it would logically follow that the first five instalments of the bonds, amounting to $215,000, are within the constitutional limit, and therefore valid.

3. At an election properly held upon due notice, September 17, 1895, the proposition so submitted was accepted by a vote of 1,602 for and 196 against the proposition. In issuing the bonds and placing them in escrow, the statutes appear to have been substantially complied with. R. S. 1878, secs. 943, 945; *Keystone Lumber Co. v. Bayfield*, 94 Wis. 494. An important question presented is as to the legal effect of such acceptance. The statute provides that, " whenever any municipality shall incur any indebtedness by the issue of bonds or municipal obligations, all the territory embraced within the limits of such municipality shall remain liable to the payment thereof, until such bonds or obligations are fully paid." R. S. 1878, sec. 944. The statute also provides that if such " definite proposition in writing," so made by the railway company, is "accepted " by the county, then it becomes "*irrevocably binding on such company*." R. S. 1878, sec. 945. It further provides that by such acceptance the proposition becomes " mutually obligatory." R. S. 1878, sec. 946. It further provides that, when such proposition is thus accepted, " then the proposition so made by such company shall be deemed obligatory as a *mutual* agreement on such company and such municipality." R. S. 1878, sec. 948. The language of the statutes seems to be clear, certain, and unambiguous. The issuing of 9,600 shares, at $25 each, of the capital stock of the railway company, so deposited in

escrow, and the agreement of the company to construct the railway in sections, as indicated, certainly was a good consideration for issuing and agreeing to pay the bonds so deposited in escrow. The contract between the county and the company, therefore, was based upon a good and valuable consideration. *Phillips v. Albany,* 28 Wis. 340; *Bound v. W. C. R. Co.* 45 Wis. 543; *Lynch v. E., L. F. & M. R. Co.* 57 Wis. 430, 468; *Hall v. Baker,* 74 Wis. 118. Moreover, under the statute cited, it became mutually and irrevocably binding upon the county as well as the company.

There is no suggestion that such contract is repugnant to any constitutional inhibition, except as mentioned, nor that it is contrary to any principle of public policy. On the contrary, this court has repeatedly sanctioned the binding force of such contracts. Thus, it has been held that "where a proposition for county aid to a railroad upon stipulated conditions has been submitted to the electors of the county, and approved by their vote, such conditions cannot afterwards be essentially modified by any agreement between the railroad company and the board of county supervisors." *Douglas Co. v. Walbridge,* 38 Wis. 179. To the same effect, *Platteville v. G. & S. W. R. Co.* 43 Wis. 493. So, it was said by Mr. Justice COLE, in one of the cases cited, that "in a number of cases which have come before this court it has, in effect, been decided that a proposition for aid, submitted by a railroad company to the voters of a town or city, and accepted by the voters, becomes a contract mutually binding upon the railroad company and the town." *Bound v. W. R. C. Co.* 45 Wis. 564. These adjudications are expressly sanctioned by Mr. Justice PINNEY, speaking for the whole court, in *State ex rel. M., T. & W. R. Co. v. Common Council of Tomahawk,* 96 Wis. 73; and, upon the strength of other adjudications, he there said: "The legislature may confer directly the necessary authority for such purposes on the proper town, city, or county authorities to represent and act for the mu-

nicipal corporation or organization, . . . and the munici-
pal authorities may be compelled to issue the bonds if the
contract has been performed on the part of the railway com-
pany." *State ex rel. G. B. & M. R. Co. v. Jennings*, 48 Wis.
549.

4. Of course, the contract so made was an executory con-
tract. Before any instalment of bonds was to be delivered
to the company, or any taxes were to be collected to make
payments thereon, the company was required to perform on
its part and construct the section of the road called for by
the contract. *Keystone Lumber Co. v. Bayfield*, 94 Wis. 491.
The most important question in the case is whether such
contract, when so made, became an indebtedness of the
county, within the meaning of the constitutional provision
quoted. That provision is found in the amendment of 1874
to sec. 3, art. XI, of the constitution. It was manifestly in-
tended to prohibit abuses which formerly existed by reason
of the failures of the legislature to sufficiently restrict the
powers of municipalities in the matter of " borrowing money,
*contracting debts*, and loaning their credit." See the section
before the amendment. Mark the language of the amend-
ment: " No county . . . *shall be allowed* to become *in-
debted in any manner or for any purpose*, to any amount,"
exceeding the limit therein fixed. This language is broad
enough to include the contracting of any such debt or the
incurring of any such liability.

Thus, it was held by this court in *Hebard v. Ashland Co.*
55 Wis. 145, that, " where a county is already indebted in a
sum exceeding five per cent. of the value of the taxable
property therein, it cannot incur a further indebtedness for
building a court house, or for any other purpose, and a tax
levied to pay such further alleged indebtedness is void."
*Earles v. Wells*, 94 Wis. 298. Such language has been con-
strued to " forbid *implied* as well as expressed indebted-
ness." *Litchfield v. Ballou*, 114 U. S. 190. So, it has been

construed to be "an absolute limitation upon the power of the county to *contract* any and all indebtedness" for any and every purpose whatsoever. *Lake Co. v. Rollins*, 130 U. S. 662. So, it has been held that the legislature cannot, either directly or indirectly, dispense with such limitation upon the power of municipal corporations "to incur debts." *Lake Co. v. Graham*, 130 U. S. 674. So, it has been held, under such provision, that, "when such municipality shall have reached the limit prescribed by the constitution, it is prohibited from making any contract whereby an indebtedness is created, even for the necessary current expenses in the administration of the affairs and government of the corporation." *Prince v. Quincy*, 105 Ill. 138. So, it has been held that, "where a city enters into a contract to pay a sum of money when certain work shall be done and accepted, the obligation thereby assumed will constitute a debt, within the meaning of the constitutional limitation of its power to incur indebtedness. Such indebtedness will be regarded as having been incurred from the date of the contract, and not postponed to the time of the completion and acceptance of the work." *Culbertson v. Fulton*, 127 Ill. 30. So, it has been held that "a contract by a city to pay an annual rental for the use of water hydrants and electric lights is a contracting of indebtedness within the meaning of a constitutional limitation." *Beard v. Hopkinsville*, 95 Ky. 239; *S. C.* 23 L. R. A. 402. To the same effect, *Howard v. Smith*, 91 Tex. 8.

The authorities cited are all to the effect that the acceptance of the proposition was "the incurring of such indebtedness," within the meaning of the constitution. This is in harmony with the ruling of this court in *Earles v. Wells*, 94 Wis. 285, where it was held, in effect, that the city had no power to assume an obligation or incur a debt or liability in excess of the constitutional limit.

5. There is another view of the question which leads to

the same conclusion. The limit of such indebtedness, as fixed in the constitutional provision in question, is "five per centum on the value of the taxable property " in the county, " to be ascertained by the *last assessment* for state and county taxes *previous to the incurring of such indebtedness*." The manifest purpose of ascertaining such value of the taxable property in the county by such "last assessment" previous to the incurring of such indebtedness was to enable all parties to know in advance whether the debt so contracted was within or exceeded the constitutional limit. In the language of Mr. Justice LAMAR, speaking for the whole court, in one of the cases cited: "In this case the standard of validity is created by the constitution. In that standard two factors are to be considered,— one the amount of the assessed value, and the other the ratio between that assessed value and *the debt proposed*. These being exactions of the constitution itself, it is not within the power of a legislature to dispense with them, either directly or indirectly, by the creation of a ministerial commission whose finding shall be taken in lieu of the facts." *Lake Co. v. Graham*, 130 U. S. 683, 684. In that case the indebtedness of the county was considered as of September 6, 1881. The bonds were authorized by a vote of a majority of the electors, November 8, 1881, and the bonds were issued January 2, 1882, and were payable in ten to twenty years. As indicated in that opinion, the two standards of validity created by the constitution, to wit, the amount of such assessed value and the ratio between that "value and the debt proposed," are indispensable requisites, and must always be kept in mind in determining the validity of any such contract. The legislature necessarily had them in mind when they provided that the acceptance of such proposition by the qualified voters of the county should be mutually and irrevocably binding, not only upon the company, but the county. This conclusion is irresistible from the fact that the same legislature which first proposed that

constitutional amendment enacted those statutes essentially as they are now in force, except that such statutes provided that no bonds should be issued by any city, etc., to an amount exceeding ten per centum upon the valuation of the taxable property therein as the same should "appear upon the last previous assessment roll," nor by a county exceeding such per centum "upon the valuation of the property therein, as fixed by the last previous state board of equalization." Laws of 1872, ch. 182. The present statute fixes the qualification of the voters for accepting the proposition as those "who were assessed for taxes on real or personal estate in such municipality, as shown by the last assessment roll." S. & B. Ann. Stats. sec. 946; *State ex rel. C., M. & St. P. R. Co. v. Blackstone*, 63 Wis. 362.

To hold that there was no liability on the part of the county by reason of such acceptance of the proposition, and no indebtedness incurred by the issuing of the bonds and placing them in escrow, until the completion of the road or some section thereof, and the delivery of the bonds, and that the question whether such constitutional limitation had been exceeded should be determined with reference to the last assessment prior to such completion of the road and delivery of the bonds, would not only overturn numerous decisions cited, but nullify the statutes and the provisions of the constitutional amendment quoted. Upon such theory, it would not be the majority of the qualified voters who had power to bind the county, but the manipulation of the different assessors who might happen to be in office at the time of such last assessment prior to such completion of the road and delivery of the bonds. If such assessors desired to defeat the payment of the bonds, they could easily do so by cutting down the assessment; and, if they desired to enforce such payment, they could do so by increasing the assessment. In other words, upon such theory, it would be untrue that the acceptance of the proposition was mutually and irrevo-

cably binding upon the county as well as the company, since the county would not be bound at all, unless such subsequent assessment should be favorable to the company. Such uncertainty would not only produce endless confusion on the part of the county or other municipality in the matter of contracting debts, but render the bonds valueless as security for the construction of the road. All such confusion and uncertainty is avoided by holding, as the law manifestly is, that the "last assessment" mentioned in the constitution is the last assessment prior to the acceptance of such proposition, or, in the language of the constitution, "the last assessment . . . previous to the incurring of such indebtedness."

In support of the contrary proposition, counsel naturally rely, mainly, upon one branch of *State ex rel. M., T. & W. R. Co. v. Common Council of Tomahawk,* 96 Wis. 73, cited above. In that case the railway company had commenced, and during the pendency of the action had seasonably completed, the road, and hence our attention was more particularly called to the rights of the parties after the railway had fully performed the contract on its part. But the writer of this opinion hereby assumes his full share of responsibility for all that is said in the *Tomahawk Case,* the same as though he had written the opinion himself. Nevertheless, after very careful consideration, we are constrained to hold that the conclusion reached on the branch of that case last mentioned is contrary to the spirit, intent, and meaning of the statutes and the constitution, as well as numerous decisions in this and other courts, and hence to that extent must be regarded as overruled.

6. The aid was voted to the *Washburn, Bayfield & Iron River Railway Company,* "its successors or assigns," and hence the trial court properly held that the county could not escape any liability merely by reason of that company having assigned, transferred, and set over to the *Bayfield Harbor & Great Western Railroad Company* all its rights,

privileges, title, and interest in and to such subscription and bonds pertaining to or to be earned by the construction of the fifth and sixth sections of the road mentioned. *Lynch v. E., L. F. & M. R. Co.* 57 Wis. 430; *Cass Co. v. Gillett,* 100 U. S. 585.

We must hold that all the bonds are valid, except the last instalment of $25,000, for the construction of the sixth section of the road, and that they are void.

*By the Court.*— That part of the judgment sanctioning the validity of such last instalment of bonds is reversed, and the judgment in all other respects is affirmed, and the entry thereof is to be modified accordingly. Neither party is to have costs, except the plaintiff is to pay the clerk's fees.

WINSLOW, J. In *State ex rel. M., T. & W. R. Co. v. Common Council of Tomahawk,* 96 Wis. 73, it was held that municipal indebtedness represented by railway aid bonds was "incurred" within the meaning of sec. 3, art. XI, Const., at the time when the contract is performed by the railway company and it is entitled to the delivery of the bonds. This decision was made upon full consideration and argument of the question, and I see no good reason for summarily overruling it before the ink is fairly dry. I therefore dissent from so much of the present decision as overrules that case, but no more.