PRUEHER, Appellant, vs. CITY OF BLOOMER and others, Respondents.

*May 6—June 1, 1942.*

18

For the appellant there was a brief by *Coe & Cameron* of Rice Lake, and oral argument by *Lawrence S. Coe.*

For the respondents there was a brief by *Walter C. Velten* of Bloomer, corporation counsel, and *Stafford & Stafford* of Chippewa Falls, and oral argument by *Mr. Harold E. Stafford* and *Mr. Velten.*

FRITZ, J.   Upon his appeal, as on the trial, plaintiff and appellant Prueher asserts a number of grounds as basis for the relief sought herein.   Upon due consideration thereof, in connection with a review of the entire record, it is our conclusion that none of the grounds relied upon can be sustained, and that it suffices to note the following in relation to matters which warrant the judgment appealed from.   The eleven notes for $1,000 each, which plaintiff seeks to have adjudged void and canceled and the city of Bloomer enjoined from paying, were executed and delivered by the city officials in its name and on its behalf to the defendant, T. E. Joiner & Company, Inc., on May 17, 1940, as renewals in exchange for prior notes for the same amount and similarly executed in April, 1939, in exchange for notes originally executed and dated September 1, 1938, and mailed at Bloomer on September 22, 1938, to T. E. Joiner & Company, Inc., which received and accepted them at Chicago, Illinois, on September 23, 1938. The original notes, as well as the renewals thereof, were issued pursuant to resolutions adopted by the city council, which authorized the borrowing of $11,000 for current and ordinary corporate expenses and the levy of a direct irrepealable tax sufficient to pay the principal and interest when it became due.

Plaintiff's principal contention is that the notes, issued in September, 1938, and likewise the renewals thereof, are invalid because when the notes were originally mailed on September 22, 1938, the city was already indebted for more than $104,399.75, which was stipulated to be then the debt

limit of the city under the provision in sec. 3, art. XI, Const., which provides that,—

"No . . . city . . . shall be allowed to become indebted in any manner or for any purpose to any amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness."

It is well established under this provision that,—

"So long as the current expenses of the municipality are kept within the limits of the moneys and assets actually in the treasury, and the current revenues collected or in process of immediate collection, the municipality may be fairly regarded as doing business on a cash basis, and not upon credit—even though there may be for a short time some unpaid liabilities. In other words, a municipality's capacity for doing business on such cash basis, with outstanding liabilities, is necessarily measured by the amount of cash on hand, and the available assets and resources readily convertible into cash, to meet the payment of such liabilities as they become due." *Earles v. Wells,* 94 Wis. 285, 298, 68 N. W. 964; *State ex rel. Marinette, T. & W. R. Co. v. Tomahawk Common Council,* 96 Wis. 73, 71 N. W. 86; *Crogster v. Bayfield County,* 99 Wis. 1, 10, 74 N. W. 635, 77 N. W. 167; *Eau Claire v. Eau Claire Water Co.* 137 Wis. 517, 119 N. W. 555.

In connection with its principal contention, plaintiff claims that on September 22, 1938, the city's total net indebtedness, computed under the rule quoted above, was $140,265.35, which would be considerably in excess of the city's constitutional debt limit of $104,399.75. On the other hand, the defendants claim that the city's total net indebtedness was but $40,698.04 on September 23, 1938. There is a controversy as to whether the indebtedness is to be determined as of September 22, 1938, when the original notes were mailed at Bloomer, or as of September 23, 1938, when they were re-

ceived at Chicago, but that difference is of no material consequence in respect to the matters hereinafter stated.

The court found that the evidence fails to show that on September 23, 1938, the city's indebtedness exceeded the sum of $104,399.75, which was permissible under the constitution. In arriving at that conclusion the court found that bonds for $27,100, which the city had issued and which plaintiff claimed were still part of its indebtedness on September 22, 1938, and should therefore be included as such in computing its net indebtedness, had been canceled by the city clerk and payment thereof entered on the city books on September 15, 1938; pursuant to a resolution which was adopted by the common council on September 14, 1938, and which recited that the public service commission had recommended its adoption. In that connection the court found that the bonds had been previously purchased and paid for by money of the city in the hands of a board of commissioners appointed by the common council to operate the electric and waterworks plant of the city as a city utility; that the resolution was passed to reimburse the general fund of the city for money due from the utility; that the utility commissioners on September 27, 1938, adopted a similar resolution; that while the latter resolution was adopted after the sale of the notes in question herein, the return of the bonds to the general fund and their cancellation had been earned as money due the city before such sale as compensation to the city under sec. 66.06 (11) (c) and (d), Stats.; that the utility commissioners were appointed pursuant to sec. 66.06 (10) (a), Stats., and were city employees and under the control of the common council, except as otherwise provided by statute; that there is no proof that the money due from the utility to the general fund of the city was less than the amount of these bonds; that the bonds ceased to be an indebtedness of the city when the city paid for them and was entitled to their cancellation before the adoption of

the resolution of September 27, 1938; and that the debts of the city, exclusive of this item, did not exceed the constitutional limit.

There is no controversy in any material respect in so far as these findings are in relation to matters of fact, but in respect to statements therein, which are virtually conclusions, plaintiff claims that on September 22 and 23, 1938, the city council could not cancel the bonds because all control over the assets of the utility had been lawfully vested in and assumed by the utility commission, so that the common council had no power to terminate the trust with which the bonds, and all assets of the utility, were impressed for the service, use, and benefit of the city's inhabitants; and that although the utility commission could lawfully surrender the municipal bonds and other assets of the utility to the city as an appropriation of surplus, under certain circumstances specified by law, it is only the commission and not the common council that can take this step. These claims are highly technical, and to conclude thereon that the city's indebtedness under the bonds in question was not effectively discharged by reason of the facts found by the court would be in disregard of the substance of the actual factual situation and the real interests and rights of the city under the circumstances, and particularly in the following respects: The bonds had been purchased and paid for by the city out of its surplus earnings accumulated by it in operating its electric and waterworks plant as a city utility in the course of years prior to an organization meeting on September 12, 1938, of commissioners appointed under an ordinance of the common council, which became effective July 21, 1938, and by which there was created a commission to take entire charge of the management and operation of the Bloomer Electric & Water Utility. Prior thereto, the accounts and finance department of the public service commission of Wisconsin made an audit of the utility as of May 31, 1938, in which there was made the following comment,—

"Since 1931 the city of Bloomer has received no appropriation of earnings from the utility. During the period the city's equity, or surplus, has increased from $87,832.50 at December 31, 1931, to $131,227.12 at May 31, 1938. In view of these facts it is recommended that the municipal bonds be returned to the city of Bloomer and that the transaction be recorded as an appropriation of surplus to municipal funds payable in bonds of the municipality."

Upon those facts and the recommendation thereon, the common council on September 14, 1938, adopted the resolution that the bonds in question be returned to the city as an appropriation of surplus of the utility to the general fund of the city payable in said bonds. Thereupon, as of September 15, 1938, Frank C. Dutton, who was the manager of the utility and also the clerk of the city, and as such had possession of the bonds,—the clerk's office and the utility office being then all one,—made a notation in the bond register as to each of the bonds in question indicating that it was canceled, and stamped on each bond the word "copy," because he did not have a rubber stamp with the word "canceled" on it. In addition, on September 27, 1938, the utility commission, by a resolution, also provided for the return of the bonds to the city as an appropriation of surplus of the utility to the general fund of the city. By this resolution there were ratified in effect the return of the bonds to the city for the reasons and the purposes stated in the common council's resolution of September 14, 1928, and the acts of Dutton in his dual capacity as city clerk and also manager of the utility in noting the cancellation of the bonds in the bond register and stamping them to indicate the cancellation thereof as of September 15, 1938. As all of these transactions in relation to the bonds from the time of the investment therein by the city of its surplus derived from the operation of its utility to the return of the bonds to the general fund of the city and their cancellation on September 15, 1938, were lawful under the provisions of

sec. 66.06 (11) (c), Stats., and were in effect ratified by the adoption of the utility commission's resolution, the court rightly concluded that they had ceased to be indebtedness of the city prior to September 23, 1938; and that consequently the item of $27,100 is not to be included as part of the city's indebtedness, as plaintiff contended.

Among other items, which plaintiff contends must be included in determining the indebtedness of the city on September 22, 1938, but which the trial court did not consider it necessary to expressly pass upon, is the sum of $9,246.16, which plaintiff designates as the "net current expense overdraft to December 31, 1938." Plaintiff claims the amount of this item is the difference between the city's actual current expense disbursements from September to the end of the year 1938, and its actual revenues available up to that time to pay the disbursements. Plaintiff claims that any deficiency in the funds provided to carry the municipality through to the end of the year is a liability and an indebtedness, whether because the amount provided was insufficient in the first place or because the funds provided for that purpose had been diverted to other uses; and that both of these reasons existed in the present case.

On the other hand, defendants claim that the future operating expenses of the city to December 31, 1938, presumably include such matters as salaries of policemen, firemen, street department, and school teachers, etc.; and defendants contend that prospective items for such indebtedness to be incurred in the future are not to be considered existing indebtedness of the city in September, 1938, that is to be included in arriving at the amount of indebtedness which in the aggregate must not exceed five per cent debt limitation prescribed by the constitution. This contention is in accord with and must be sustained under the rule definitely adopted and applied in *Herman v. Oconto,* 110 Wis. 660, 672, 673, 86 N. W. 681, when the court said,—

"It is also claimed that the wages of teachers for the entire period covered by their contracts should be considered in like manner. The question seems to be deemed an open one in this state, notwithstanding *Stedman v. Berlin,* 97 Wis. 505, and many pages of the brief are taken up with a discussion of the principle and the authorities. We deem the *Stedman Case* decisive against defendant. The point was directly involved, and was disposed of by the following language, in answering a claim similar to the one here made: 'It is entirely well settled that this claim is unfounded in law. Where a municipality contracts for annual services for a series of years, to be paid for by annual payments, such contract does not come within such prohibition. In such case the whole amount which may ultimately become due does not constitute a debt, within the meaning of the constitution. To that end, regard is to be had only to the amount that may become due within a certain year or other period. 1 Dillon, Mun. Corp. § 136a, and cases cited.' . . . It is true there are a number of cases in other states in conflict with this view; but, however debatable the ground, we see no good reason for receding from the position taken in the *Stedman Case,* and hereby affirm and declare that to be the law of this state."

Upon deducting the above items of $27,100 and $9,246.16 from the amount which plaintiff claims constituted the city's indebtedness on September 22, 1938, there remains as such indebtedness the sum of $182,497, and upon subtracting therefrom $78,577, claimed by plaintiff to be the amount of the cash on hand and available assets and resources readily convertible into cash to meet such indebtedness, there remains the sum of $103,920, which is less than the five per cent debt limit of $104,399.75. But in assuming that $78,577 is the amount to be thus subtracted, as claimed by plaintiff, there have not been taken into consideration receivables aggregating $19,140, which were owing to the city for utility taxes, sidewalk assessments, money payable by Chippewa county, and relief payments due from other cities, and which defendants claim should be subtracted also. Likewise in assuming above that of

the indebtedness, as claimed by plaintiff, there remain $182,497 before subtracting the offset of $78,577, there is included in that sum of $182,497 an item of $87,325, which plaintiff claims was the amount owing to Charles Gambsky as the contract price, under a contract signed on September 6, 1938, for the construction of a sewage disposal project. Defendants contend that amount is incorrect because the contract price was reduced to $72,144 by a supplementary contract signed September 14, 1938, and furthermore because the city's obligation to pay was limited under the contract to the sum of $42,900, raised and segregated for that purpose upon the sale of "general obligation" bonds issued by it, and an additional sum of $32,464, which it was to receive as a PWA grant from the federal government. The latter ground seems to be sound, and in that event the city's obligation under the Gambsky contract would be $75,364, instead of $87,325, and by reason of the difference between those amounts the city's net aggregate indebtedness would be reduced to $91,959, instead of being $103,920, as stated above. However, as neither of these amounts are in excess of the permissible debt limit, and the conclusion as to the higher amount is reached without taking into consideration defendants' contentions in relation to the amount of the city's indebtedness under the Gambsky contract and to the additional offsets claimed by them, it is not necessary to determine the issues raised in those respects.

*By the Court.*—Judgment affirmed.