William DIECK, and James Tatro, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,†

v.

UNIFIED SCHOOL DISTRICT OF ANTIGO, Langlade, Marathon and Shawano counties, Wisconsin, Linda Szitta, Jeffrey Wagner, Michael Hunter, Gary Kieper, Nancy Igl, Thomas Hartman, Dr. Robert Keener, Shirley Nagel, Steven Brettingen, Antigo School Building Leasing Corporation, and First Wisconsin Trust Company, Milwaukee, Wisconsin, Defendants-Respondents.

Court of Appeals

*No. 89-2356. Oral argument May 25, 1990.—Decided June 19, 1990.*

(Also reported in 458 N.W.2d 565.)

† Petition to review granted.

135

On behalf of the plaintiffs-appellants, the cause was submitted on the brief of *Richard J. Weber* and *David H. Perlman* and the cause was orally argued by *Richard J. Weber* of *Kelley, Weber, Pietz & Slater, S.C.* of Wausau.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Thomas Terwilliger* and *Cassandra B. Westgate* and the cause was orally argued by *Cassandra B. Westgate* of *Terwilliger, Wakeen, Piehler & Conway, S.C.* of Wausau.

Before Cane P.J., LaRocque and Myse, JJ.

CANE, P.J.    William Dieck and James Tatro, as members of a class (collectively plaintiffs), appeal a summary judgment in favor of the Unified School District of Antigo (district), school board members, and other parties to a complex lease purchase agreement for a new high school. The plaintiffs sought a declaratory judgment that the district lacked the power to enter into this transaction. Their central argument is that the district's transaction created an indebtedness that requires taxpayer approval. Because the transaction as presently constituted violates no laws, summary judgment in favor of the defendants was warranted, and we affirm.

For more than twenty years the voters of the district have refused to provide financing for the construction of a new high school. After numerous rebuffs, the district contracted to lease a new high school from the Antigo School Building Leasing Corporation (corporation), a ch. 181, Stats., corporation. The corporation will hold legal title to the new school. The First Wisconsin Trust Company (trustee) will hold the deed during the lease period. Instead of paying rentals to the corporation, the district will pay the holders of Certificates of Participation (certificates). The certificates will be insured against default under a bond insurance policy. During the lease period, the district can exercise its nonappropriation right under the contract and terminate the lease agreement. If the district continues to lease, it has the option to purchase the school for $10 at the end of the twenty-year period.

## RIPENESS

■■■

At present, portions of the transaction have not been finalized. Neither the certificates nor the bond insurance policy has been issued. In order for a court to exercise its jurisdiction and grant a declaratory judgment, four criteria must be satisfied. *Sipl v. Sentry Indem. Co.,* 146 Wis. 2d 459, 464, 431 N.W.2d 685, 687 (Ct. App. 1988). One of these criterion is that the issue involved in the controversy be ripe for judicial determination. *Id.* "A matter is not ripe for declaratory relief unless the declaration 'is conclusive upon the controversy submitted to the court.' " *Id.* at 466, 431 N.W.2d at 688 (quoting *Loy v. Bunderson,* 107 Wis. 2d 400, 411, 320 N.W.2d 175, 182 (1982)). As *Sipl* states, this test is jurisdictional and, if not met, strips the court of the power to hear the case as a matter of law. *Id.* at 464, 431 N.W.2d at 687. A trial court may also refuse to grant declaratory relief as a matter of discretion if "there are other controversies between the parties" or if "the declaration would be tangential to the underlying dispute." *Id.* at 465 n.1, 431 N.W.2d at 687 n.1 (citing *American Med. Servs. v. Mutual Fed. S&L Ass'n,* 52 Wis. 2d 198, 204, 188 N.W.2d 529, 532 (1971)).

There are several aspects of the current controversy that are not ripe for declaratory judgment. There is disagreement over what form the certificates and the bond insurance policy will take when and if they are issued. Plaintiffs urge us to rule based on the sample documents contained in the initial agreement. They contend that the trial court erred by not taking a sample bond insurance policy into account and by failing to strike portions of an affidavit characterizing the requirements for such a policy. Defendants argue that the certificates and the bond insurance policy may differ

138

in significant ways from the samples if and when they are issued. Defendants have discussed removing the district as a signatory on the certificates and having the corporation sign them instead. Defendants also may make wholesale changes in the language of the bond insurance policy and are at least exploring the idea of issuing uninsured certificates. There is language, particularly in the sample bond insurance policy and other documents describing the as yet unprocured policy, that concerns us. However, ruling on the extent of the district's obligations under the documents before they are issued and when the parties have not stipulated to their eventual contents would not be "conclusive upon the controversy submitted to this court," since they may eventually be issued and challenged in substantially different form. Therefore we do not examine the sample documents.[1]

■■

The trial court, in the exercise of its discretion, might have refused to examine the entire transaction because the certificates and the bond insurance policy are critical to it. Nonetheless, the trial court chose to rule on the remainder of the issues raised by the agreement, and doing so was not an abuse of discretion. The issues raised, apart from those concerning the certificates and the bond insurance policy, are sufficiently separate and developed to permit a declaration of rights. If the trial court had rejected the basic framework of the agreement, the specifics of the certificates and the bond insurance policy would have

---

[1]The trial court reached much the same conclusion: "Had the bond actually been signed and it was a bond policy in effect the Court would rule differently. But inasmuch as it has not, it is speculative at this point in time to assume what the bond insurance policy will in fact contain."

been irrelevant. Thus, the trial court had the power to address the declaratory judgment motion as it related to those documents that have been signed and in which there is no anticipation of changes. *See Sipl,* 146 Wis. 2d at 468 n.4, 431 N.W.2d at 688–89 n.4. In fact, the district argues that had the court not ruled on the validity of the underlying agreement, the transaction would have stalled and the other issues would have been moot.

Both parties filed motions for summary judgment and agree that the issues before the court are matters of law amenable to summary judgment. Summary judgment methodology has been set out by this court on numerous occasions. *In re Cherokee Park Plat,* 113 Wis. 2d 112, 115-16, 334 N.W.2d 580, 582-83 (Ct. App. 1983). Our methodology is the same as the trial court's and our review is de novo. *Id.* at 115–16, 334 N.W.2d at 582.

## CONSTITUTIONAL LIMITATIONS

Article XI, sec. 3, of the Wisconsin Constitution limits the debt a school district, or other municipal corporation, may incur. It provides both a limitation on the amount of the debt and a requirement that the district levy an irrepealable direct tax sufficient to pay off the interest yearly and the principal within twenty years.

The Wisconsin Supreme Court has developed a number of tests to determine whether indebtedness has been incurred under the constitution. *See* Kiernan, *Wisconsin Municipal Indebtedness: Part I—The Power to Become Indebted and Its Limits,* 1964 Wis. L. Rev. 173, 197. For our purposes, one is dispositive. If a municipality may avoid its obligation or if there remain

conditions precedent to it, there is no indebtedness. *Id.*[2]

The defendants argue that the nonappropriation clause in the lease purchase agreement renders their obligations conditional, and therefore the agreement does not create debt under the constitution.

> [T]he leases provide that the obligation to pay rent is subject to available appropriations by the Legislature. Since there is no binding obligation on the part of the state to pay rent for the full terms of the leases, it is inconceivable that a debt is incurred or that a purchase of the property is contemplated.

*State ex rel. Thomson v. Giessel,* 271 Wis. 15, 37, 72 N.W.2d 577, 588 (1955); *see also* Note, *State and Municipal Lease-Purchase Agreements: A Reassessment,* 7 Harv. J.L. & Pub. Pol'y 521, 536 (1984).

Plaintiffs attempt to distinguish *Thomson* in several ways. Their major argument is that we must look beyond form to substance. They claim that this transaction is not a true lease; rather, it is a disguised installment purchase plan. They point to the fact that the district leases the school for twenty years for an amount allegedly higher than its fair market value and then receives the property by exercising a $10 purchase

---

[2]Kiernan, *supra,* cites *Columbia County v. Board of Trustees,* 17 Wis. 2d 310, 116 N.W.2d 142 (1962); *State ex rel. Rogers v. Milligan,* 269 Wis. 565, 69 N.W.2d 485 (1955); *Meier v. City of Madison,* 257 Wis. 174, 42 N.W.2d 914 (1950); *Prueher v. City of Bloomer,* 241 Wis. 17, 4 N.W.2d 186 (1942); *Milwaukee Elec. Ry. & Light Co. v. City of Milwaukee,* 173 Wis. 329, 181 N.W. 298 (1921); *State ex rel. Atwood v. Johnson,* 170 Wis. 251, 176 N.W. 224 (1919); *Connor v. City of Marshfield,* 128 Wis. 280, 107 N.W. 639 (1906); *Herman v. City of Oconto,* 110 Wis. 660, 86 N.W. 681 (1901); *Stedman v. City of Berlin,* 97 Wis. 505, 73 N.W. 57 (1897); and 8 Op. Att'y Gen. 196 (1919).

option.[3] The key fact, however, is that the lease can be terminated, by nonappropriation, each year. Because the district may terminate the agreement on an annual basis by nonappropriation, whether it is intended that the property be purchased and whether the purchase option is for a nominal sum are not relevant to the constitutional analysis.

It is true that under prior cases it has been held that when the property automatically becomes the municipality's at the end of a "lease," the transaction is in reality a purchase agreement. In *Earles v. Wells,* 94 Wis. 285, 68 N.W. 964 (1896), the court struck down a "lease" agreement where a city issued bonds that covered the total purchase price of a water plant, and where the plant was to revert to the city after the lease period. *Earles* was distinguished in *Stedman v. City of Berlin,* 97 Wis. 505, 73 N.W. 57 (1897). The *Stedman* and *Earles* transactions were in most respects similar, except at the end of the *Stedman* lease the municipality had an option to purchase, rather than automatically acquiring the facility as a right. The *Stedman* court found that this feature allowed the municipality to avoid the constitutional restrictions on incurring indebtedness. *Id.* at 512-13, 73 N.W. at 59-60.

In *Milwaukee Elec. Ry. & Light Co. v. City of Milwaukee,* 173 Wis. 329, 181 N.W. 298 (1921), the city

---

[3]The plaintiffs also point to a legal opinion by counsel for the district concluding that the new school will be owned by the district and therefore exempt from property taxes. Defendants are certainly free to try to achieve tax-exempt status; whether they will be successful is another matter. The issue of who owns the building for property tax purposes is not before us and, as defendants argue, the concept of beneficial incidents of ownership for tax-exemption purposes is different and serves a different purpose from the constitutional limitation on indebtedness.

agreed to pay, as rent, an amount sufficient to cover the cost of the facility within twenty-two years. The city had an option to purchase at the end of this period and was required to pay a penalty if it withdrew from the lease agreement prior to purchase. The court upheld the transaction despite a constitutional challenge. The *Milwaukee Elec.* court did state that:

> Doubtless a contract could be drawn in which a charge purporting to be for the expense of depreciation could be made so excessive as to amount in fact to a contract for instalment payments upon a capital investment with the intent of evading constitutional or statutory provisions.

*Id.* at 341–42, 181 N.W. at 303. This statement, which is dicta, suggests that a trial court is required to ascertain the answers to factual questions concerning the intent of the parties and the reasonableness of the payments. We do not believe this to be the case. "The measure of rental payments does not convert a lease to a purchase contract. It does not follow that merely for the reason that rent equals debt service, it is not rent, but constitutes installments on a purchase contract." *Thomson,* 271 Wis. at 42, 72 N.W.2d at 591.

The constitutional restrictions at issue guard against indebtedness, not creative financing.

> [I]t must be kept in mind that the purpose of a debt limitation is not to prevent the municipality from acquiring buildings or public works, but to place a limitation on the extent to which it may pledge its credit and hence burden the taxpayers. And if it can acquire such property without becoming indebted therefor or exceeding the constitutional limitation,

neither the spirit nor the letter of the provision has been violated.

*Id.* at 36, 72 N.W.2d at 587–88.[4] We hold that the critical questions are whether the payments can be halted by the district and, if this is answered in the affirmative, whether the facility automatically will become the district's at the end of the lease period. The transaction at issue satisfies the first criterion because the district, by retaining the right to nonappropriation, does not incur an indebtedness. Similarly, the transaction does not run afoul of *Earles* because the property does not become the district's at the end of the agreement. Having concluded that this is a lease, and that future obligations under it may be avoided by the district, our constitutional inquiry is ended.[5]

## STATUTORY LIMITATIONS

(A)   Authority to Enter into the Lease Purchase Agreement

The district has the power to enter into a lease under sec. 120.10(5), Stats.[6] The question is whether this

---

[4]*See also Burnham v. City of Milwaukee,* 98 Wis. 128, 132, 73 N.W. 1018, 1019 (1897): "It will not do to say that [the city] will probably make the payments, or that it would be foolish not to do so, but we must be able to say that it has contracted, either expressly or impliedly, to do so."

[5]Plaintiffs also attack *Thomson* because the statutory procedures at issue were later repealed. This argument goes to statutory authority or perhaps public policy, but it does not disturb the breadth of the court's constitutional reading.

[6]Section 120.10, Stats., provides in part:

**Powers of annual meeting.** The annual meeting of a common or union high school district may:

statutory power extends to the lease purchase agreement at issue. The plaintiffs argue that the district lacks the statutory power to conduct several portions of the transaction. A school district has only those powers that are conferred directly by statute or by necessary implication. *Neis v. Board of Educ.,* 128 Wis. 2d 309, 314-16, 381 N.W.2d 614, 616-17 (Ct. App. 1985). We hold that the district acted within its statutory authority.

■

The Department of Public Instruction (DPI) has issued a legal opinion on whether a school district may enter into a lease purchase agreement. The DPI cited the statutory definition of "lease" governing the landlord-tenant relationship:

> "Lease" means an agreement, whether oral or written, for transfer of possession of real property, or both real and personal property, for a definite period of time. A lease is for a definite period of time if it has a fixed commencement date and a fixed expiration date or if the commencement and expiration can be ascertained by reference to some event, such as completion of a building.

Sec. 704.01(1), Stats. Under this and other standard definitions,[7] the transaction at issue qualifies as a lease.

. . ..
(5)  Building sites. Designate sites for school district buildings and provide for the erection of suitable buildings or for the lease of suitable buildings for a period not exceeding 20 years with annual rentals fixed by the lease.

[7] *See, e.g.,* Webster's Third New Int'l Dictionary 1286 (1976): "Lease: a contract by which one conveys lands, tenements or hereditaments for life, for a term of years or at will or for any less interest than that of the lessor, usu. for a specified rent or compensation."

Relying on the constitutional analysis set forth in *Thomson* and *Earles*, the DPI found that the distinction between a lease and an installment purchase is the same under sec. 120.10(5), Stats., and cited compliance with the following factors as determinative.

1. When the lease expires, both parties will be in the same status as when the lease started;

2. title to the real estate and buildings at all times remains with the original owner/landlord; that is, there is no passing of title under the lease transaction itself; and

3. the lease specifically provides that the obligation to pay rent is subject to available appropriations and there is no binding obligation on the part of the tenant (municipality) to pay rent for the full term of the lease or to exercise the option to buy.

We agree with the DPI that a district's statutory power to "lease" is not, in the case of lease purchase agreements, narrower than its constitutional power. As detailed earlier, the transaction qualifies as a lease under constitutional analysis, and for the same reason it is also a lease under sec. 120.10(5).

(B)   Statutory Debt Restrictions

1.   Chapter 67, Stats.

Plaintiffs argue that the transaction fails to comply with the restrictions on indebtedness contained in ch. 67, Stats. School districts may borrow and issue municipal obligations pursuant to ch. 67. Sec. 120.13(29), Stats. Section 67.03(1) restricts municipalities to borrowing money and issuing municipal obligations for purposes and procedures specified in ch. 67. "Municipal obligation" is defined in

sec. 67.01(6): " 'Municipal obligation' includes every lawful promise or engagement in writing by a municipality to pay at a specified future time a specified sum of money."

There is no case law dealing directly with the issue of whether this type of transaction constitutes a municipal obligation. However, two commentators, Kiernan, *supra,* at 248 n.444, and Schilling, *Wisconsin Municipal Debt Finance: An Outlook for the Eighties,* 63 Marq. L. Rev. 539, 554 (1980), argue persuasively that ch. 67, Stats., applies only to municipal borrowing, and not to other credit obligations. The same conclusion is reached by the attorney general. 63 Op. Att'y Gen. 309, 310 (1974).[8] Kiernan states:

> [Section 67.03(1)] reads . . . "municipalities may borrow money and issue municipal obligations therefor . . .." It then proceeds to deny the power except as specifically granted. The definition of "municipal obligation" given in [sec. 67.01(2)] is broad enough to encompass most credit obligations. However, the title of [sec. 67.03(1)], the use of the conjunctive "and," and the obvious functioning of chapter 67 all rebut the notion that the restriction applies to any other than borrowing.

Kiernan, *supra,* at 248 n.444. We agree with this analysis and do not believe the legislature intended ch. 67 to apply to areas other than municipal borrowing. If ch. 67 applies only to borrowing, then the transaction does not violate the statute. "Borrowing" has been defined as a

---

[8]Attorney general opinions are of "some persuasive value when a court later addresses the meaning of the same statute." *Town of Vernon v. Waukesha County,* 102 Wis. 2d 686, 692, 307 N.W.2d 227, 230 (1981).

pledge of full faith and credit. Schilling, *supra*, at 544 n.18. Due to the nonappropriation clause, the district forfeits no assets by terminating the lease, and there is, as yet, no municipal borrowing here.[9]

2. Section 120.44, Stats.

Section 120.44(2), Stats., prevents the school board of a unified school district from incurring any indebtedness without voter approval:

> The public schools of a unified school district shall be under the management, control and supervision of a school board. The school board shall have the powers and duties of the school board and annual meeting in a common school district . . .. No annual meeting shall be held in a unified school district. The school board shall not, in the name of the school district, issue bonds or incur other indebtedness without approval of the electors of the school district in any instance where the school board of a common school district is not authorized to do so.

The alleged conflict is between the portion of sec. 120.44(2), Stats., that states for the purposes of incurring indebtedness, the board of a unified district has no more power than the board of a common district, and the portion that states the board of a unified school district also has the power of an annual meeting of a common school district. Both parties apparently accept

---

[9]Plaintiffs argue that the district will forfeit approximately $500,000 worth of fixtures to the building if they exercise their nonappropriation right. We are unable to locate in the record the basis for this argument. Because the plaintiffs do not cite to the record, we do not consider the argument. *See Keplin v. Hardware Mut. Cas. Co.*, 24 Wis. 2d 319, 324, 129 N.W.2d 321, 323 (1964).

the premise that in a common school district, it would take, at minimum, an annual meeting to approve the transaction.

Plaintiffs contend that because the board of a common district would lack the power to enter into this transaction without an annual meeting, so does the board of a unified district. Defendants point out this construction results only if one labels the transaction an indebtedness, and that there is no authority for the proposition that sec. 120.44(2), Stats., indebtedness differs from constitutional indebtedness. Additionally, they point to the absurd result that would follow—namely, that a unified school district would have to submit every current expense item to the voters because it lacks an annual meeting, despite the fact that the statute grants it the power of an annual meeting. We agree with defendants that sec. 120.44(2) is no more a bar to the board entering into this transaction than the provisions of art. XI, sec. 3, of the Wisconsin Constitution.

## (C)   Prohibition Against Commingling Funds

Plaintiffs also allege that the district impermissibly commingled funds. They claim the district paid $500,000 out of its general fund as a down payment on the project. In *Riesen v. School Dist. No. 4,* 192 Wis. 283, 290–91, 212 N.W. 783, 786 (1927), the court held that money from the maintenance and operation fund could not be diverted to build a school.

The case at hand differs in significant respects from that in *Riesen.* In *Riesen,* the district used money from the general fund, to be used to maintain and operate the schools, for the purpose of building a school. The court found that the money had been improperly diverted,

149

and, because it had to be returned, the amount owed for building a new school constituted an indebtedness.

In this case, the money was used for the lease of a new school, rather than the purchase of a new school. The district is required by sec. 120.10(10m), Stats., to maintain a separate fund for the financing of "current and future capital . . . sites." A lease is not a capital investment, and therefore this section is inapplicable. Section 120.10(5), Stats., which grants the district the power to lease buildings, does not require a segregated fund. This reading comports with that given to the statutes by the DPI, which has found that payments on a lease purchase agreement should be made out of a school's general fund.

(D)   Leasing from a Dummy Corporation

The plaintiffs also argue that the district lacks the authority to make a deal with a "dummy" corporation. Plaintiffs argue that the transaction at issue is patterned almost completely after sec. 120.10(18) and 120.19, Stats. (1979–80). These provisions were repealed by secs. 1348 and 1350, ch. 20, Laws of 1981 (effective July 31, 1981). They contend that the explicit repeal of these provisions indicates that the legislature did not implicitly grant power for the district to perform the same transaction through other statutory sections.

Defendants disagree and argue that the corporation was established under ch. 181, Stats., not sec. 120.19, Stats. (1979–80). The defendants are correct, and the repeal of sec. 120.19 is not a bar to the district's entering into this transaction.

Section 120.19, Stats. (1979–80), allowed the district to *set up* a dummy corporation. Its repeal does not block the district from doing business with a ch. 181,

Stats., corporation. None of the board of directors of the corporation is a member of the school board. There is nothing in its articles of incorporation to indicate that it was set up solely to benefit the district. School districts would have been able to enter into lease purchase agreements prior to the creation of sec. 120.19, and there is nothing to indicate that the repeal of the statute was intended to strip them of this power.

## CONCLUSION

In conclusion, we hold that on those issues in this action ripe for adjudication, the trial court properly granted defendants' motion for summary judgment. The district has the authority to enter into the lease purchase agreement and has not at this time created an indebtedness that violates constitutional or statutory prohibitions. However, whether certificates or the bond insurance policy that may eventually be issued exceed the district's authority is not ripe for determination and is not addressed in this opinion.

*By the Court.*—Judgment affirmed.